2023 IL App (4th) 220281

NO. 4-22-0281

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 22, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE CITY OF EAST PEORIA, ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| CHARLES MELTON II; THE BOARD OF TRUSTEES | ) | No. 21MR65 |
| OF THE FIREFIGHTER'S PENSION FUND OF THE | ) | |
| CITY OF EAST PEORIA; and RANDY HURD, in His | ) | Honorable |
| Official Capacity as President of the Board of Trustees of | ) | Bruce Phillip Fehrenbacher, |
| the Firefighter's Pension Fund of the City of East Peoria, | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |

JUSTICE BRIDGES delivered the judgment of the court, with opinion.[1]
Justices Harris and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff, the City of East Peoria (City), contests the occupational disease disability

pension awarded to defendant and firefighter Charles Melton II by the codefendant Board of

Trustees of the Firefighters' Pension Fund of the City of East Peoria (Board). Melton sought the

disability pension based on a stroke that he suffered in March 2020. The City argues that (1) the

applicable statute required that the physicians appointed to examine Melton conduct in-person

physical examinations, (2) the Board relied on the erroneous belief that the City conceded that the

cause of Melton's prior renal disease was work-related, (3) Melton's need for anticoagulants was

a disabling condition that predated his stroke and disqualified him from receiving an occupational

---

[1] Justice Bridges participated in this appeal and authored the decision but has since retired. Our supreme court has
held that the departure of an authoring judge prior to the filing date will not affect the validity of a decision so long
as the remaining two judges concur. *Kinne v. Duncan*, 383 Ill. 110, 113-14 (1943).

disease pension, and (4) the Board erred in finding that Melton's stroke resulted from his service as a firefighter. We affirm.

¶ 2                                                I. BACKGROUND

¶ 3        Melton made a written application dated July 8, 2020, for an occupational disease disability pension. He alleged a "work[-]related stroke brought on by exposure as a firefighter for the City of East Peoria." He alleged that he was "[p]recluded from performing normal work activity by statute and medical recommendations."

¶ 4        The Board selected three physicians to submit written medical opinions answering various questions, including whether Melton was disabled, whether the disability resulted from his service as a firefighter, and the duration of the disability. The physicians did not conduct a physical examination of Melton but rather responded to written questions of the Board based on the physicians' review of Melton's medical records as provided by the Board. The physicians did not testify at any hearings.

¶ 5        The report of Dr. Michael I. Peters, who was board certified in emergency medicine, stated as follows. Melton was a 56-year-old lieutenant on the East Peoria Fire Department who suffered a stroke while at home and off duty on March 11, 2020. Melton's medical history consisted of:

> "Factor V Leiden deficiency
>
> Right lower extremity superficial venous thrombosis 2009
>
> Pulmonary embolus right lower lobe 2017
>
> Right cerebellar ischemic stroke 3/11/20
>
> Novel MYH9 gene mutation with thrombocytopenia diagnosed 2009 ***
>
> Hereditary persistent fetal hemoglobin ***

Hypertension since age 20 years

Chronic kidney disease stage 3 with secondary hyperparathyroidism

Left renal cell carcinoma without metastasis 2013

Hyperlipidemia

Obesity

Obstructive sleep apnea using CPAP

Benign prostatic hypertrophy

Gilbert's syndrome

Gastroesophageal reflux disease

Hypothyroidism

Left lumbar radiculopathy."

¶ 6        Dr. Peters opined that Melton had three disabilities, namely his stroke, his need for lifelong anticoagulation medication due to his history of factor V Leiden deficiency and renal cell carcinoma with recurrent thrombosis, and his long-standing hypertension. Melton was "fully recovered" from the stroke but was "disabled for at least one year after the stroke per [National Fire Protection Association (NFPA)] 1582 9.13.4.1.1 (2018)." See generally Standard on Comprehensive Occupational Medical Program for Fire Departments, NFPA 1582 (Nat'l Fire Prot. Ass'n 2018). Further, his use of anticoagulant medication "disable[d] him from full firefighter duties due to the risk of life[-]threatening hemorrhage per NFPA 1582 9.16.4.1." Also, Dr. Peters stated that Melton was disabled due to his hypertension, which he had since age 20 but was well controlled until the stroke, and Melton now required "confirmation of blood pressure control." Regarding the likely duration of the disabilities, Dr. Peters stated that Melton could be reassessed in March 2021 regarding his stroke and that he was presently without residual stroke symptoms or

neurologic deficit, such that Dr. Peters expected that the stroke disability would not be permanent. Melton's need for lifelong anti-coagulant use was permanent. Melton was likely to return to good blood pressure control, but he had permanent renal and organ damage, and the "end organ damage may require permanent disability."

¶ 7 In response to the question of whether the alleged disabilities were a result of Melton's service as a firefighter, Dr. Peters wrote:

> "His ischemic stroke disability is likely secondary to long standing hypertension. His disability due to required lifelong anti-coagulation is for recurrent thrombosis due to malignancy and inherited factor V Leiden deficiency. Of the two, his history of renal cell carcinoma is the greater thrombosis risk. *** Renal cell carcinoma has been identified as a malignancy occurring with increased incidence in firefighters."

Dr. Peters opined that Melton could perform in a light duty capacity if it were made available to him.

¶ 8 Dr. Jeffrey D. Williamson-Link, who was board certified in occupational medicine, similarly outlined Melton's medical history. On the subject of the nature and extent of any disability, Williamson-Link stated that Melton suffered from a cerebellar infarction that would, under NFPA 1582, require a waiting period of at least 12 months and meeting additional criteria before being considered to return to active duty without limitations or restrictions. "Additionally [Melton was] also on long term anticoagulation treatment for history of Factor V Leiden and Pulmonary Embolism which would restrict him from performing Essential Job Task #8 which involves climbing ladders, operating from heights and uneven surfaces." The lifelong need to remain on anticoagulation would prevent him from being "able to be cleared for full firefighting

duties." In response to the question of whether any disabilities were the result of service as a firefighter, Williamson-Link wrote:

> "It is my medical opinion that one cannot discount the cumulative effects of active duty of Firefighting in regards to his stroke. Though the firefighter did have other risk factors, the occupational stressors of active firefighting is well-documented and its effects on the Cardiovascular System. Additionally the Firefighter has a history of Factor V Leiden, and has subsequently developed Pulmonary Embolism. Based on the review of the medical records, this appears to be a genetic disorder and would not be considered to be part of cumulative effects of active duty."

Williamson-Link stated that Melton could perform in a light duty capacity if such a position were available.

¶ 9        Dr. Mark N. Rubin, a board-certified vascular neurologist, submitted a report that stated that Melton had made an excellent functional recovery from his cerebellar stroke and was cleared for unrestricted duty by his primary care physician in June 2020, but he had a "strict indication to be on anticoagulation for the rest of his life which, *per se*, according to the [NFPA standards], ma[de] him unable to perform multiple essential job tasks." Dr. Rubin stated that Melton had a lifelong disability caused by his need for anticoagulation.

¶ 10        Melton "had pre-existing conditions that contributed to his risk of stroke, including morbid obesity, hypertension, dyslipidemia, obstructive sleep apnea, chronic kidney disease, diabetes mellitus, and Factor V Leiden with a history of recurrent deep vein thrombosis and a history of pulmonary embolus." Dr. Rubin stated that Melton "mention[ed] an 'exposure' but no evidence of an occupational exposure, let alone one that would rise above his pre-existing conditions as a generator of stroke, was presented. It [was] most likely that his pre-existing

conditions were the sole cause of his stroke." Dr. Rubin continued that Melton's "disability, generated by his need for life-long anticoagulation, preceded his stroke and [was] due solely to a genetic pre-existing condition." Dr. Rubin could not "formulate a means by which the aggregate of his occupational duties contribute[d] to his need for anticoagulation." Rubin stated that Melton could perform in a limited or light duty capacity if such a position were available.

¶ 11     The Board held a hearing on Melton's application for disability benefits on November 13, 2020. Melton testified in relevant part as follows. He was 56 years old and had been employed by the East Peoria Fire Department since 2000. At the time of hiring, he passed the preemployment physical. Leading up to March 10, 2020, he held the position of lieutenant. His normal duties included being in charge of the station, the calls, and everyone's safety on a call and coordinating with other crews on calls. While not on calls, he was involved with maintaining the station, education, and inspections. Melton performed all of the duties listed in the job description for his position.

¶ 12     On March 10, 2020, Melton got off of work at about 11 a.m. While at home later that day, he experienced dizziness for a few minutes while doing paperwork. At midnight, Melton woke up his wife because he was dizzy and could not sleep. She was a nurse and took his blood pressure, which was high. They decided to go to a hospital, where a computed tomography scan did not reveal anything but magnetic resonance imaging showed that he had a stroke in his right cerebellum.

¶ 13     Melton was released from the hospital on March 15, 2020. He later began physical therapy. Melton met with Dr. Marshall on May 12, 2020, and discussed returning to work, which Melton felt able to do. Dr. Marshall provided a return-to-work slip, but the City referred Melton to Dr. Moody for a fitness for duty examination, which occurred on June 17, 2020. Dr. Moody

performed "a real small examination" just to see if Melton could stand and walk. He then excused himself for a short time and upon returning said that, according to NFPA standards, Melton had to wait 12 months to return to full duty after a stroke. Dr. Moody cleared Melton for light duty. Melton did some light duty work but was then told that there was no longer any light duty work available. On July 2, 2020, he received a separation letter from the City terminating his employment. Since August 2020, Melton had not seen a physician regarding his stroke, had not been accepted back to work by the City, and had not been offered a light duty job by the City.

¶ 14 Melton had hypertension since his early twenties, but it was controlled before his stroke. He had problems with blood pressure following his stroke, but after several medication changes, it was back under control. Melton denied ever having been told that he had Gilbert's Syndrome, which would be from high bilirubin in the blood, or having diabetes.

¶ 15 Melton was diagnosed with kidney cancer in 2013 and had to have a kidney removed. Melton filed a workers' compensation claim and settled his case with the City, which acknowledged that his cancer was related to his work activities as a firefighter. Melton was able to return to work in 2013 and did not receive any continuing care or medicine related to the kidney cancer, other than getting his creatine levels checked by a nephrologist on a regular basis.

¶ 16 Factor V Leiden was a condition where factor V in one's blood protein does not work properly and can cause clotting problems. Melton did not find out that he had the condition until after his daughter was born and she was diagnosed with it; his condition was "benign," and he did not need treatment for it, including blood thinners. However, in 2017, he had a pulmonary embolism, and to dissolve the blood clot, he was given blood thinners. The doctor then suggested taking a low maintenance dose of blood thinner afterwards to help prevent a future clot, and Melton

agreed; the medication was optional at the time. After the stroke, the doctors changed the type of blood thinner and increased the dose.

¶ 17        After a closed executive session, the Board voted five to zero in favor of an oral motion to find that Melton was disabled for service as a firefighter "due to the blood thinner that he [was] required to take." The Board voted three to two in favor of an oral motion to find that the disability resulted from service as a firefighter, entitling him to an occupational disease disability pension.

¶ 18        In a written decision dated February 11, 2021, and adopted by a three to two vote, the Board found that Melton had over 20 years of creditable service when he had a stroke on March 11, 2020. The Board found that he was disabled for the performance of full duties as a firefighter under section 4-112 of the Illinois Pension Code (Pension Code) (40 ILCS 5/4-112 (West 2020)) and that his disabilities were due to a stroke resulting from service as a firefighter.[2] The Board ruled that Melton was entitled to receive an occupational disease disability pension as provided for in section 4-110.1 of the Pension Code (40 ILCS 5/4-110.1 (West 2020)).

¶ 19        In arriving at its conclusion, the Board made the following findings. The reason for disability listed in Melton's application was a stroke. The physicians' reports, as well as all other medical reports in the record, affirmed that Melton suffered a stroke. The reports stated that Melton had recovered from his stroke, but per NFPA regulations, he could not return to full firefighting duties for at least 12 months after a stroke. Per statute, a permanent disability is one that lasts for a continuous period of not less than 12 months. See *id*. § 4-105b. The Pension Code provided for restoration to active service upon recovery (*id*. § 4-112), but Melton was still required to take

_____

[2]During the hearing, the Board's attorney stated that "the decision order outline[d] that evidence that support[ed] the findings the [B]oard made."

- 8 -

anticoagulants for the rest of his life. All three physicians agreed that the NFPA made lifelong use of anticoagulants disabling for full firefighter duties. Melton testified that he was voluntarily taking anticoagulants before the stroke but that it became mandatory after the stroke, demonstrating the effect of the stroke on Melton's disability.

¶ 20    Regarding whether the disability was the result of service as a firefighter, the Board stated that Dr. Rubin opined that the disability was not duty-related but rather was caused by preexisting conditions. One of the conditions he named was diabetes, but Melton testified that he was not diabetic. Another condition listed was chronic kidney disease, but "[e]vidence in the record indicates [that Melton's] kidney cancer was job related and resulted in a worker's compensation settlement. *** The implication here[ ] is that job related kidney cancer was a preexisting condition that caused, at least in part, [Melton's] stroke." The Board stated that Dr. Peters opined that Melton's stroke "disability was likely secondary to long standing hypertension." He opined that the disability from anticoagulation medication was for recurrent thrombosis due to "malignancy" and factor V Leiden deficiency, with the renal cell carcinoma being the greater thrombosis risk. The Board stated that "[t]his again tend[ed] to indicate [that Melton's] thrombosis risk (which require[d] life-long anticoagulation) [bore] a nexus to job-related kidney cancer." The Board stated that Dr. Williamson-Link opined that one could not discount the cumulative effects of active-duty firefighting in causing the stroke. Based on all of these considerations, the Board found that Melton's disability resulted from service as a firefighter.

¶ 21    On March 19, 2021,[3] the City filed a complaint for administrative review in the trial court. It argued that the Board's ruling was contrary to law and against the manifest weight of the

---

[3]Final administration decisions are appealed within 35 days of when the decision was served upon a party, as opposed to the date the decision was rendered. 735 ILCS 5/3-103 (West 2020).

evidence because the ruling applied the wrong standard of causation, effectively finding that Melton's stroke must have resulted from his service as a firefighter merely because one of his stroke risk factors, his nondisabling renal cancer, may have been related to his firefighting duties. The City further argued that the overwhelming weight of the evidence showed that Melton's stroke was a result of several factors, such as genetics and hypertension, that predated his employment as a firefighter. In a subsequent supporting brief, the City also argued that the physicians were required to have examined Melton in person, as opposed to having examined only his medical records.

¶ 22        Melton filed a motion to dismiss, arguing that the trial court lacked jurisdiction because the City was not a party to the proceedings below. The trial court denied the motion to dismiss on August 20, 2021.

¶ 23        The trial court issued its ruling on March 7, 2022. It found that, under section 1-101.3 of the Pension Code (40 ILCS 5/1-101.3 (West 2020)), the City was a " 'party in interest' " to the administrative proceeding. The trial court stated that, pursuant to section 4-112 of the Pension Code, the Board must have the firefighter examined by three physicians but that the manner in which the examinations were to be performed was not specified by statute. The trial court stated that the purpose of the examinations was to assist the Board in determining whether the firefighter had a disability and the nature and the extent of the disability and that nothing in the statute required the physicians to personally examine the firefighter. That is, nothing in the statute prohibited the physicians from reaching opinions based on the firefighter's medical records. The trial court additionally found that evidence in the record supported the Board's decision and that its findings were not clearly erroneous, and it denied the City's petition for administrative review.

¶ 24    The City timely appealed. The Board and Melton have filed separate appellee briefs.

¶ 25                                II. ANALYSIS

¶ 26                                A. Jurisdiction

¶ 27    We first address Melton's argument that this case should be dismissed for lack of jurisdiction. Melton argues that although he filed his written application for benefits on July 8, 2020, and the pension board held a meeting on August 11, 2020, the City did not take any action until November 13, 2020, during the hearing on the disability application, when the City unsuccessfully tried to enter evidence into the record without being a party. Melton asserts that the City did not move to intervene until the next hearing on February 11, 2021, when the Board voted to approve the decision. Melton maintains that, when the City failed to obtain a last-minute intervention, it appealed the decision to the trial court.

¶ 28    Melton argues that, because the City did not participate in the underlying proceedings, it did not have standing to appeal the Board's decision and consequently we must dismiss the appeal for lack of jurisdiction. Melton cites *Village of Vernon Hills v. Heelan*, 2015 IL 118170, ¶ 38, where the court stated that the Village could not complain of an alleged procedural due process violation because it chose not to petition to intervene in the disability pension proceeding or object to the pension board's decision. The court stated, "If an established procedure exists that appears to provide due process, a plaintiff cannot skip that procedure and use the courts to recover what the plaintiff wants." *Id.* Melton argues that, similarly, the City failed to take part in the process, depriving it of standing and the trial and appellate courts of jurisdiction.

¶ 29    Whether we have jurisdiction is a question of law that we review *de novo*. *Russell v. Board of Education of Chicago*, 379 Ill. App. 3d 38, 43 (2007).

¶ 30　　　　　Melton conflates the doctrines of standing and jurisdiction. The doctrine of standing requires some injury in fact to a legally recognized interest and is meant to assure that issues may be raised in court only by parties with a sufficient stake in the controversy's outcome. *State ex rel. Leibowitz v. Family Vision Care, LLC*, 2020 IL 124754, ¶¶ 26, 28. Standing is an affirmative defense that will be forfeited if not timely raised. *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 252-53 (2010). "[S]tanding is not a prerequisite to subject matter jurisdiction" (*In re Jawan S.*, 2018 IL App (1st) 172955, ¶ 43), the latter referring to a court's power to "hear and determine cases of the general class to which the proceeding in question belongs" (*Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 334 (2002)). Subject-matter jurisdiction cannot be waived. *People v. Brown*, 2020 IL 124100, ¶ 17.

¶ 31　　　　　Moreover, Melton's reliance on *Heelan* is puzzling, as that case involved neither standing nor subject-matter jurisdiction. To the extent that Melton is arguing that the City was required to participate in the board proceedings before appealing to the trial court, Melton is incorrect. In *Karfs v. City of Belleville*, 329 Ill. App. 3d 1198, 1204 (2002), the court held that a municipality could seek review of a pension board's decision if the decision impacted a duty or interest of the municipality, even though the municipality had not participated in the administrative proceedings below. The City here argues on appeal, among other things, that the Board violated the Pension Code by not requiring physical examinations by physicians, which is an issue that indirectly impacts the City's finances and extends beyond this individual case. See also *Village of Alsip v. Portincaso*, 2017 IL. App (1st) 153167, ¶¶ 19, 21 (village had an interest in the proper expenditure of public funds and in not becoming liable under the Public Safety Employee Benefits Act (820 ILCS 320/1 *et seq.* (West 2012))). Accordingly, the City could seek review of the Board's decision without having participated in the underlying proceedings.

B. In-person Examinations

¶ 33         Turning to the merits, the City first argues that the Board violated section 4-112 by awarding Melton an occupational disease disability pension without first arranging for his examination by three physicians selected by the Board. Section 4-112 states:

> "A disability pension *shall not be paid until disability has been established by the board by examinations of the firefighter at pension fund expense by 3 physicians selected by the board* and such other evidence as the board deems necessary. The 3 physicians selected by the board need not agree as to the existence of any disability or the nature and extent of a disability." (Emphasis added.) 40 ILCS 5/4-112 (West 2020).

The City argues that the statute's plain language requires, through the use of the word "shall," that a firefighter be examined by three board-selected physicians before being able to receive an occupational disease disability pension. The City asserts that the physicians here performed only half their duties, where they issued reports without first conducting in-person examinations.

¶ 34         Melton responds that there is no requirement in the statute that the examinations be in person and, if the legislature had such an intent, it could have easily added that language to the statute. Melton argues that, even if physical examinations are required in some instances, they are not required for occupational disease disability pensions. Melton argues that section 4-112 must be read in conjunction with section 4-110.1, which is entitled "Occupational disease disability pension" and states:

> "The General Assembly finds that service in the fire department requires firefighters in times of stress and danger to perform unusual tasks; that firefighters are subject to exposure to extreme heat or extreme cold in certain seasons while

performing their duties; that they are required to work in the midst of and are subject to heavy smoke fumes, and carcinogenic, poisonous, toxic or chemical gases from fires; and that these conditions exist and arise out of or in the course of employment.

An active firefighter *** who is found, pursuant to Section 4-112, unable to perform his or her duties in the fire department by reason of heart disease, stroke, tuberculosis, or any disease of the lungs or respiratory tract, resulting from service as a firefighter, is entitled to an occupational disease disability pension during any period of such disability for which he or she has no right to receive salary." *Id.* § 4-110.1.

Melton argues that, unlike line of duty disabilities, the disability is presumed established under the occupational disease disability statute.

¶ 35 Melton notes that firefighters are required to undergo a physical examination at the outset of hiring. See *id.* Melton argues that he had originally proven himself to be occupationally disease free, such that once he was diagnosed with a stroke, the disability itself was considered established. Melton maintains that, logically, this furthers the intent of the legislature to protect firefighters because disabling occupational diseases often do not have clear onset dates but rather result from cumulative exposure over time.

¶ 36 The Board relatedly argues that Melton had been subjected to multiple prior in-person physical examinations since his stroke, including an in-person examination by the City's chosen physician, Dr. Moody, and that the records of all of these in-person physical examinations were submitted as evidence for the hearing.

¶ 37 The Board further argues that section 4-112 is devoid of any language requiring in-person physical examinations of a firefighter. The Board contends that because "examination"

of the firefighter" is wholly undefined, the Board may interpret its meaning, which it did to determine that opinions based on independent reviews of the record were sufficient. See *General Motors Corp. v. Motor Vehicle Review Board*, 224 Ill. 2d 1, 13 (2007) (stating if there is a reasonable debate about a statute's meaning, the court will give deference to the retirement board's interpretation, though its interpretation is not binding). The Board argues that its interpretation is logical and reasonable because, unlike an overt physical injury disability claim, the evidence of occupational disease is often entirely internal and diagnosed by treating physicians with imaging or other testing. The Board maintains that even Dr. Moody effectively relied solely on a review of Melton's medical records to come to his ultimate conclusions, as his in-person physical examination was brief. The Board asserts that conducting further in-person exams would only needlessly increase the cost of the hearing and delay its resolution.

¶ 38        The City's argument presents a question of statutory interpretation. The primary rule in statutory interpretation is to ascertain and give effect to the legislature's intent, which is best indicated by the statute's language, when given its plain and ordinary meaning. *International Ass'n of Fire Fighters, Local 150 v. City of Peoria*, 2022 IL 127040, ¶ 12. Where the statute's language is clear and unambiguous, we will apply it as written without resorting to aids of statutory construction. *Corbin v. Schroeder*, 2021 IL 127052, ¶ 44. Generally, the construction of a statute presents a question of law that we review *de novo.* See *Sperl v. Henry*, 2018 IL 123132, ¶ 23. However, "an agency's interpretation of a statute is given deference on *de novo* review unless it is erroneous, unreasonable, or conflicts with the statute." *Medponics Illinois*, *LLC v. Department of Agriculture*, 2021 IL 125443, ¶ 31; see also *McDougall v. White*, 355 Ill. App. 3d 483, 486 (2005) ("Courts must give substantial weight and deference to the interpretation placed on a statute or regulation by the agency charged with its administration and enforcement.").

¶ 39　　　　Courts have used dictionaries as a resource in determining the plain and ordinary meaning of words. *Castro v. Police Board of Chicago*, 2016 IL App (1st) 142050, ¶ 32. "Examination" is defined, as pertinent here, as "the act or process of examining: the state of being examined." Merriam-Webster's Collegiate Dictionary 434 (11th ed. 2006). "Examine" is defined as:

>　　　　"1a: to inspect closely
>
>　　　　b: to test the condition of
>
>　　　　c: to inquire into carefully; INVESTIGATE
>
>　　　　2a: to interrogate closely ***
>
>　　　　b: to test by questioning in order to determine progress, fitness, or knowledge ~ *vi* : to make or give an examination." *Id.*

We agree with Melton and the Board that, in light of the definitions of "examination" and "examine," the plain language of section 4-112 does not require that the examination of the firefighter be in-person and/or a physical examination. The statute requires "examinations of the firefighter," but it does not require a specific type of examination. "Courts are not at liberty to depart from the plain language and meaning of a statute by reading into it exceptions, limitations, or conditions [that] the legislature did not express." *In re Hernandez*, 2020 IL 124661, ¶ 18.

¶ 40　　　　Where the legislature has intended an in-person or physical examination in other situations, the legislature has explicitly stated so. For example, section 4 of the Sexually Dangerous Persons Act (725 ILCS 205/4 (West 2020)), titled "Examination by evaluator," states:

>　　　　"After the filing of the petition, the court shall appoint two qualified evaluators to make a *personal examination* of the alleged sexually dangerous person, to ascertain whether the person is sexually dangerous, and the evaluators

shall file with the court a report in writing of the result of their examination, a copy

of which shall be delivered to the respondent." (Emphasis added.)

Section 12 of the Workers' Occupational Diseases Act (820 ILCS 310/12 (West 2020)) refers to "examination," but the statute itself is titled "Physical examinations; autopsy," which makes clear that the legislature meant that "examination" requires a "physical examination." Also, section 12 states that "[a]n employee may also be required to submit himself for examination by medical experts under subsection (c) of Section 19" (*id.* § 12(a)), which in turn provides, as relevant here, that the "Commission may on its own motion order an impartial physical or mental examination of a petitioner whose mental or physical condition is in issue" (*id*. § 19(c)(1)), again referencing the type of examination. See also Ill. S. Ct. R. 215 (eff. Jan. 1, 2018) (also referring to "physical and mental examination"). As section 4-112 does not have similar limiting language to require an in-person or physical examination, we may not read such a requirement into the statute.

¶ 41        Consideration of the use of "shall" in the statute ("pension shall not be paid until disability has been established by the board by examinations of the firefighter at pension fund expense by 3 physicians selected by the board" (40 ILCS 5/4-112 (West 2020)) does not change this result, as "shall" modifies "not be paid" and does not otherwise impact the meaning of "examinations." As the Board argues, the logic of our interpretation of the statute is on display here, as Melton had extensive medical records, including test results, and his stroke and other medical issues were not ones that the physicians would have been physically able to assess by seeing him in person. Based on the medical records, the physicians had differing opinions to answer the questions posed to them by the Board, which the Board considered in arriving at its ultimate decision, in accordance with section 4-112 and other applicable statutes.

¶ 42                        C. Melton's Renal Disease

¶ 43    We next address the City's argument that we can take judicial notice that the City never conceded that the cause of Melton's renal disease, an alleged risk factor for stroke, was duty-related, contrary to Melton's testimony. The City maintains that, although Dr. Rubin opined that Melton's stroke was not related to work, the Board noted that Dr. Rubin also opined that his preexisting kidney disease, among other factors, also put him at a risk for stroke. The City points out that the Board wrote: "Evidence in the record indicates [that Melton's] kidney cancer was job related and resulted in a worker's compensation settlement. *** The implication here[ ] is that job related kidney cancer was a preexisting condition that caused, at least in part, [Melton's] stroke." The City argues that, in addition to the fact that no doctor opined that kidney cancer caused Melton's stroke, the Board's order is fatally flawed in that it assumed that the City had conceded the cause of Melton's cancer. The City asserts that we can take judicial notice of its workers' compensation settlement with Melton, in which it disputed Melton's claim that his cancer was job-related. The City argues that the Board was not entitled to presume that the cancer was job-related and then presume that the cancer caused Melton's stroke.

¶ 44    The Board argues that, while the issues of the renal cancer, the cancer's relation to the claim of being job-related, and the cancer's connection to the stroke were examined by the physicians and briefly by the Board, it made no findings that the kidney cancer directly caused Melton's stroke but rather viewed it as a possible contributory factor. The Board maintains that whether or not the City conceded the cause of Melton's cancer as work-related in his workers' compensation claim was not a necessary or significant factor that the Board used in its decision. The Board argues that the City must admit that it nonetheless entered into a settlement agreement on the job-related cancer issue and that the evidence submitted by the City in the circuit court about the settlement came long after the Board had made its decision. The Board argues that, regardless,

the claimed issue never took center stage, as the Board considered the entirety of Melton's medical history and the physicians' reports, not the kidney cancer alone, and did not rely on the City's position in the workers' compensation case.

¶ 45 "Judicial notice is proper where the document in question is part of the public record." *Lavite v. Dunstan*, 2019 IL App (5th) 170114, ¶ 69. Here, we need not directly take judicial notice of the workers' compensation settlement, as the City already made it part of the trial court record. In any event, we agree with the Board that the Board never found that the City conceded that Melton's kidney cancer was duty-related and that the cancer did not play a critical role in its ultimate determination that the stroke was duty-related.

¶ 46                               D. Anticoagulants

¶ 47 The City further argues that Melton's disabling need for anticoagulants predated his stroke, such that his stroke cannot be the cause of any inability to perform his duties. The City asserts that all evidence established that by the November 13, 2020, pension hearing, Melton had fully recovered from his stroke. The City argues that the stroke prevented Melton from performing his firefighter duties only because NFPA guidelines recommended that a firefighter wait a full 12 months after a stroke before returning to work. The City continues that NFPA guidelines are not part of the Pension Code, which focuses on whether a firefighter can perform his duties, which Melton can. The City maintains that, to the extent that the Board was entitled to adopt NFPA's position that a stroke is *per se* disabling for at least 12 months, the Board must also accept the NFPA's position that Melton's reliance on anticoagulant medications was also *per se* disabling, as set forth in section 9.16.4.1 of NFPA 1582. The City argues that the use of the medication predated his stroke by three years, such that Melton should not have been working in the years leading up to the stroke. The City asserts that the Board cannot deny that this was a disabling condition, where

at the close of the hearing, the Board made an explicit finding that the need for blood thinners was a disabling condition.

¶ 48        The City argues that it was Melton's lifelong dependence on anticoagulants that was the disabling event and, as a matter of law and a matter of logic, any subsequent condition (such as a stroke) cannot be the cause of Melton's inability to perform his firefighter duties. The City argues that the record is devoid of evidence that Melton's need for blood thinners was a result of his job duties instead of a result of hereditary and preexisting factors. The City further maintains that, as a matter of law, a need for anticoagulant medication is not an "occupational disease" as the term is defined in section 4-110.1.

¶ 49        The Board argues that Melton's preexisting medical conditions, including his prior voluntary use of anticoagulants, does not disqualify him from receiving an occupational disease pension. The Board argues that there was no evidence that Melton was prohibited from performing full unrestricted duties prior to his stroke and that he continued those duties even after voluntarily beginning the medications in 2017. The Board argues that there is no dispute that Melton suffered a stroke and as a result of the stroke he thereafter was prescribed a mandatory, higher dose of anticoagulants that he must take for the rest of his life. The Board asserts that it found that the stroke, though relatively minor, mandated the use of a higher dose of anticoagulants that disables him under NFPA standards. The Board argues that it weighed the medical evidence and relied on the opinions of Drs. Peters and Williamson-Link that Melton was disabled primarily by his stroke and not his use of anticoagulants alone. The Board maintains that although none of the doctors specifically stated that Melton's occupational exposure directly caused his stroke, the Board provided great deference to Dr. Williamson-Link's opinion that "one cannot discount the cumulative effects of active-duty firefighting in regard to his stroke." The Board cites *Evert v.*

*Board of Trustees of the Fire Fighters' Pension Fund of Lake Forest*, 180 Ill. App. 3d 656, 660 (1989), where the court stated,

> "It is not sufficient that there are mere conflicts in the testimony or that an opposite conclusion might be reasonable; since the weight of the evidence and the credibility of the witnesses are within the province of the agency, there need be only some competent evidence in the record to support its findings."

¶ 50 On appeal from an administrative case, we review the administrative agency's decision and not the trial court's determination. *Village of Oak Park v. Village of Oak Park Firefighters Pension Board*, 362 Ill. App. 3d 357, 365 (2005). When reviewing an administrative agency decision, the standard of review depends on whether the issue is one of fact, one of law, or a mixed question of fact and law. *Cooke v. Illinois State Board of Elections*, 2021 IL 125386, ¶ 50. We review *de novo* an agency's ruling on a question of law. *Western Illinois University v. Illinois Educational Labor Relations Board*, 2021 IL 126082, ¶ 30. We will accept an agency's factual findings unless they are against the manifest weight of the evidence. *Id.* An agency's finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Speed District 802 v. Warning*, 242 Ill. 2d 92, 137 (2011).

¶ 51 An intermediate standard applies for mixed questions of law and fact, which occurs where the dispute pertains to the legal effects of a set of facts. *Hanks v. Illinois Department of Healthcare & Family Services*, 2015 IL App (1st) 132847, ¶ 19. We review mixed questions of law and fact under the clearly erroneous standard. *Medponics Illinois, LLC*, 2021 IL 125443, ¶ 29. An agency's decision is clearly erroneous only where the reviewing court is left with a definite and firm conviction that the agency committed a mistake. *Western Illinois University*, 2021 IL 126082, ¶ 70. The clearly erroneous standard applies to this issue.

¶ 52      We note that the City questions the physicians' and Board's reliance on NFPA standards, but it has not developed this argument, therefore forfeiting it for review. See *Atlas v. Mayer Hoffman McCann, P.C.*, 2019 IL App (1st) 180939, ¶ 33 (a reviewing court is not a repository into which an appellant may dump the burden of argument and research, nor is it our obligation to act as an advocate, and the failure to clearly define issues and support them with authority results in forfeiture of the argument). The City's assertion that Melton's use of anticoagulants before his stroke rendered him disabled is not persuasive, as it is not clear whether voluntary use of low levels of anticoagulants could be considered disabling and, even if it could, Melton could have presumably stopped taking the medication at the time it was voluntary and no longer be considered disabled. More significantly, whether or not Melton was disabled before his March 2020 stroke was simply not a question before the Board. Accordingly, the City may not rely on an alleged prior *per se* disability to assert that Melton could not be considered disabled from the stroke.

¶ 53                                    E. Stroke

¶ 54      Last, the City argues that the Board's decision was erroneous where no evidence established that Melton's duties contributed to his stroke or that the stroke was a result of his service as a firefighter. The City argues that Dr. Rubin attributed the stroke to Melton's preexisting conditions, including morbid obesity, hypertension, high cholesterol, and sleep apnea, and that Dr. Peters attributed the stroke to long-standing hypertension. The City maintains that Dr. Williamson-Link did not give a cause for the stroke but stated that "one cannot discount the cumulative effects of active duty firefighting in regards to the stroke." The City recognizes that even a single physician's opinion can support a pension board's decision as to disability (see *Carrillo v. Park Ridge Firefighters' Pension Fund*, 2014 IL App (1st) 130656, ¶ 34) but argues that this is not the

issue here, as two physicians stated that the stroke was not a result of Melton's service as a firefighter and the third physician stated only that one could not "discount" the possibility. The City argues that Dr. Williamson-Link's reasoning was simply that Melton was a firefighter and that firefighters are prone to strokes. According to the City, that was insufficient to meet Melton's modest burden of proof.

¶ 55    The City maintains that there was simply no evidence in the record that Melton's work predisposed him to stroke. The City argues that, by Melton's own account, his duties were "normal," including supervising emergency calls but also nonhazardous tasks such as station maintenance and public education. The City notes that Melton's stroke occurred at home rather than on the job, and it argues that the stroke was hardly surprising given Melton's preexisting conditions. The City argues that, if the evidence is sufficient to find that Melton's service as a firefighter was the cause of his stroke, it is tantamount to saying that any stroke suffered by any firefighter must be presumed an occupational disease, but the legislature has declined to adopt such a sweeping proposition.

¶ 56    The City argues that the weakness of the evidence is shown from the fact that the Board was inconsistent as to the basis of its findings, first finding that Melton's reliance on anticoagulants was the disabling event but later finding in its written order that the stroke was the disabling event. The City argues that it appears from the Board's minutes in the record that the Board did not read the written order but instead relied on its counsel's inaccurate statement that the order reflected findings made at the close of the hearing. The City maintains that, although considerable deference is given to administrative findings, this court should reject "the false premise that, if there is any evidence in the record that supports the Board's decision, regardless

of how minuscule, then the Board's decision must be affirmed." *Lambert v. Downers Grove Fire Department Pension Board*, 2013 IL App (2d) 110824, ¶ 40.

¶ 57       The Board argues that its written decision dated February 11, 2021, was the only decision subject to administrative review in this matter and that it was the only decision setting forth its findings of fact, reasoning, and analysis that courts consider during the administrative review process. See *Howe v. Retirement Board of the Firemen's Annuity & Benefit Fund of Chicago*, 2013 IL App (1st) 122446, ¶ 25. The Board highlights that *Howe* stated that "the written decision must be prepared and provided to each board member at or before the time the Board votes to take final action on the application." *Id.* The Board argues that, contrary to the City's argument, the vote taken on November 13, 2020, was not a final decision under *Howe* but rather an oral vote on an oral motion, which was not reviewable under the Administrative Review Law and not binding on the Board's later approved and issued written decision.

¶ 58       The Board argues that its decision was supported by its careful review of the evidence presented. The Board maintains that, contrary to the City's assertion that there was no evidence that his work predisposed him to a stroke, Melton testified as to what he experienced on the job when he confirmed that he performed the duties of a firefighter, as listed in the detailed job description. The Board argues that the City's position also ignores the fact that the disability suffered by Melton, as the Board found, was the result of cumulative exposure to the significant hazards of the job over the course of his firefighting career. The Board argues that the City has failed to show that the Board's decision was against the manifest weight of the evidence.

¶ 59       Melton argues that the City's arguments about causation are irrelevant because disability is presumed. Melton argues that the phrase "resulting from service as a firefighter" in

section 4-110.1 (40 ILCS 5/4-110.1 (West 2020)) is a term of art defined under section 6(f) of the Workers' Compensation Act (820 ILCS 305/6(f) (West 2020)), which states:

"Any condition or impairment of health of an employee employed as a firefighter *** which results directly or indirectly from any *** heart or vascular disease or condition, hypertension, *** or cancer resulting in any disability (temporary, permanent, total, or partial) to the employee shall be rebuttably presumed to arise out of and in the course of the employee's firefighting *** and, further, shall be rebuttably presumed to be causally connected to the hazards or exposures of the employment."

Melton argues that all of the City's arguments are based on him having the burden of proof that he is disabled as a result of his firefighting career, but that ignores the language of sections 4-110.1 and 6(f).

¶ 60 Melton argues that this is not to say that he was free of other preexisting conditions that may have contributed to his stroke. Melton maintains that the Board was not required to find that his stroke was caused by his firefighting duties but rather that they essentially found that his stroke was presumed to have been caused by his firefighting duties and the evidence of his preexisting conditions simply did not overcome the presumption.

¶ 61 Whether Melton had the burden of proof of showing a disability or whether the disability was presumed, as Melton argues, is a question of law that we review *de novo*. See *Western Illinois University*, 2021 IL 126082, ¶ 30. Melton relies on section 4-110.1 of the Pension Code, quoted *supra* ¶ 33, which contains legislative findings about dangerous conditions that firefighters are exposed to as a result of their employment. However, in *Lindemulder v. Board of Trustees of the Naperville Firefighters' Pension Fund*, 408 Ill. App. 3d 494, 503 (2011), the court

rejected a similar argument, holding that section 4-110.1's use of the phrase "resulting from service as a firefighter" requires that the firefighter subject to the conditions and suffering heart disease, stroke, tuberculosis, or any disease of the lungs or respiratory tract prove that the disability resulted from their work as a firefighter. In contrast, section 4-110.1 explicitly creates a presumption that "cancer must (and is rebuttably presumed to) arise as a result of service as a firefighter," as opposed to the other medical conditions mentioned. 40 ILCS 5/4-110.1 (West 2020). Melton sought the disability pension based on his stroke and not on his cancer. The Workers' Compensation Act is a separate statutory scheme, and as section 4-110.1 sets forth the applicable burden of proof for occupational disease disability based on a stroke, we will not look to a separate legislative enactment to determine the burden of proof. See also *Rozak v. Kankakee Firefighters' Pension Board*, 376 Ill. App. 3d 130, 138 (2007) (firefighter has the burden of proving he is entitled to disability pension). Therefore, Melton had the burden of proving his entitlement to the disability pension based on his stroke.

¶ 62        Regarding the Board's original finding on November 13, 2020, that Melton was disabled for service as a firefighter due to his required use of anticoagulants, we agree with the Board that under *Howe*, the finding was not part of the Board's final, written decision that is the subject of our review. Though the City argues that the Board members did not read the decision before voting on it, this argument is pure speculation, notwithstanding the attorney's statement that the order reflected findings made at the close of the hearing.

¶ 63        Whether a disability is duty-related is a question of fact reviewed under the manifest weight of the evidence standard. *Village of Oak Park*, 362 Ill. App. 3d at 370; see also *City of Peoria v. Firefighters' Pension Fund of City of Peoria*, 2019 IL App (3d) 190069, ¶ 34 (whether evidence in the record supported the pension board's grant of a line of duty disability pension was

a question of fact). We conclude that the Board's finding that Melton's stroke resulted from his "service as a firefighter" was not against the manifest weight of the evidence.

¶ 64　　　　Melton himself does not dispute that he had numerous preexisting conditions that could have contributed to the stroke. However, a firefighter is "not required to prove that a duty-related accident or illness was the primary or originating cause of his disability; rather, he only needed to prove that a duty-related accident or illness aggravated, contributed, or exacerbated his disability." *Covello v. Village of Schaumburg Firefighters' Pension Fund*, 2018 IL App (1st) 172350, ¶ 43. In other words, Melton did not have to prove that his stroke resulted solely from his firefighting duties. Though the City disputes that Melton demonstrated that he was subject to hazardous work conditions, Melton testified that his duties included being on firefighting calls and that he performed all of the duties listed in the job description for his position. The occupational disease disability statute itself, section 4-110.1, includes legislative findings that firefighters are exposed to dangerous conditions as a result of their employment. See also *Bremer v. City of Rockford*, 2016 IL 119889, ¶ 31 ("[S]ection 4-110.1 recognizes that firefighters work in dangerous conditions and provides compensation when a firefighter contracts one of the listed diseases from repeated exposure to those conditions over a set period of time."); *Lindemulder*, 408 Ill. App. 3d at 503 ("Courts are not empowered to adjudicate the accuracy of legislative findings, but must accord great deference to the legislature's fact-finding authority."). As these diseases are recognized as possibly resulting from repeated exposures over long periods of time, that Melton suffered the stroke at home as opposed to while at work does not undermine his claim.

¶ 65　　　　As stated, Williamson-Link wrote in his report:

　　　　　"It is my medical opinion that one cannot discount the cumulative effects of active duty of Firefighting in regards to his stroke. Though the firefighter did have

other risk factors, the occupational stressors of active firefighting is well-documented and its effects on the Cardiovascular System."

By stating that "one cannot discount the cumulative effects" of firefighting in regard to the stroke and that such connections were well documented, Williamson-Link was opining that it could well be a contributing cause of the stroke. Williamson-Link was not making a sweeping statement as to all firefighters but rather stating this opinion specifically as to Melton after reviewing his personal medical records. Additionally, Dr. Rubin included Melton's kidney cancer in his list of possible contributing factors to the stroke, which also could have arisen from work-related activities.

¶ 66        "It is particularly within the Board's province to accord weight to the evidence, resolve conflicts presented by the evidence, and determine the credibility of witnesses," and "[i]f the record contains evidence supporting the agency's decision, the decision should generally be affirmed." *Prawdzik v. Board of Trustees of Homer Township Fire Protection District Pension Fund*, 2019 IL App (3d) 170024, ¶ 36. The reviewing court may not reweigh the evidence or make independent factual determinations (*id.*), even if the opposite conclusion is reasonable (*Covello*, 2018 IL App (1st) 172350, ¶ 42). As the record here contains sufficient evidence to support the Board's conclusion, we cannot say that it is against the manifest weight of the evidence.

¶ 67                                    III. CONCLUSION

¶ 68        For the reasons stated, we affirm the judgment of the Tazewell County circuit court.

¶ 69        Affirmed.

*City of East Peoria v. Melton*, 2023 IL App (4th) 220281

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Tazewell County, No. 21-MR-65; the Hon. Bruce P. Fehrenbacher, Judge, presiding. |
| **Attorneys for Appellant:** | Robert B. McCoy, of Miller, Hall & Triggs, LLC, of Peoria, for appellant. |
| **Attorneys for Appellee:** | Jennifer Bonesteel, of Stephen P. Kelly, Attorney at Law, LLC, of Peoria, for appellee Charles Melton II.<br><br>Richard J. Reimer and Nemura Pencyla, of Reimer Dobrovolny & Labardi PC, of Hinsdale, for other appellee. |