NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240032-U

NO. 4-24-0032

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 10, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| SHAWN RYLATT, LISA RYLATT, JANET SAVAIANO, and AMIE LOTZER, | ) ) | Appeal from the Circuit Court of |
| Plaintiffs-Appellants, | ) | Winnebago County |
| v. | ) | No. 23MR38 |
| DR. DENNIS D. CHRISTENSEN; ROCKFORD FAMILY PLANNING CENTER, LLC; THE CITY OF ROCKFORD; and THE ROCKFORD ZONING BOARD OF APPEALS, | ) ) ) ) | |
| Defendants-Appellees. | ) ) ) | Honorable Ronald A. Barch, Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Harris and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court reversed, finding the Rockford Zoning Board of Appeals (Board) erred in finding two plaintiffs lacked standing; the Board clearly erred in determining the defendant doctor and clinic's proposed use was consistent with a decades-old prior legal nonconforming use established by a special use permit; and subsequently, the trial court erred in affirming the Board and granting defendants' motion to dismiss.

¶ 2    Plaintiffs, Shawn Rylatt, Lisa Rylatt, Janet Savaiano, and Amie Lotzer (collectively, plaintiffs) appealed to the Rockford Zoning Board of Appeals (Board), challenging the October 3, 2022, certificate of zoning compliance issued by Rockford's zoning officer, Scott Capovilla. Capovilla found defendants Dr. Dennis D. Christensen and Rockford Family Planning Center, LLC's (RFPC) proposed use of 611 Auburn Street in Rockford, Illinois (Property) complied with a decades-old special use permit (SUP) and variance. The City of Rockford (City), Dr. Christensen, and RFPC challenged plaintiffs' standing before the Board and argued it

should affirm Capovilla's decision to issue the certificate of compliance. The Board found the plaintiffs lacked standing and affirmed Capovilla's decision.

¶ 3 Plaintiffs filed a two-count complaint in the trial court, naming as defendants Dr. Christensen, RFPC, the City, and the Board (collectively, defendants) and seeking judicial review and alleging a statutory claim. The court affirmed the Board on judicial review and dismissed the remaining count.

¶ 4 On appeal, plaintiffs present three arguments: (1) the Board (and the trial court) erred in finding plaintiffs lacked standing to challenge the certificate of zoning compliance issued by Capovilla; (2) the Board erred in affirming Capovilla's decision because Dr. Christensen and the RFPC 's proposed use did not conform to the prior legal nonconforming use established by a prior SUP and variance; and (3) the court erred in dismissing count II, seeking statutory relief.

¶ 5 I. BACKGROUND

¶ 6 A. Dr. Chin Obtained a SUP for the Property

¶ 7 This case began over five decades ago. In September 1981, Dr. Sam K. Chin, D.C., filed an "Application For Registration For Home Occupation" with the City. Dr. Chin listed his address as 611 Auburn Street in Rockford. He named his occupation as "chiropractic physician." He noted his proposed business would be confined to the first floor of his residence, he would use a chiropractic adjustment table, and he would see patients "[b]y appointment only."

¶ 8 In October 1981, Dr. Chin applied for a SUP and a variation for the Property. The application noted the existing use of the Property included "chiropractic physician office and home under 'Home Occupation License.' " Dr. Chin's original application was edited, presumably by a Rockford zoning official, with red pencil. This revised application requested a

SUP to "re-establish a non-conforming use [in R1]," specifically a "Home Occupation of a medical type." He requested four variations to the SUP relating to signage, landscaping, a fence, setbacks, and "[e]mployment of a non member of household."

¶ 9        The Board acted on Dr. Chin's application in November 1981. It granted Dr. Chin a SUP "to re-establish a non-conforming use (a Home Occupation of a medical nature), subject to compliance with all provisions of the Home Occupation Ordinance." The Board likewise granted the variations relating to landscaping, the fence, and the existing setbacks. The Board took no action on Dr. Chin's "requested Variations pertaining to advertising signs or the employment of persons *NOT* residing on the property because these two (2) items are covered by the provisions of the Home Occupation Ordinance, and the Board has no authority to act on exceptions or variations therefrom." (Emphasis in original.)

¶ 10        The record indicates Dr. Chin appealed the Board's actions and, in the course of that appeal, Rockford's public services committee considered the matter and submitted a report to the Rockford City Council (City Council). On January 4, 1982, the matter came before the City Council, and meeting minutes provided the following:

> "Alderman Johnson moved the adoption of a Public
> Services committee report recommending that the City Council
> grant Appeal #81/23, thereby sustaining the Zoning Board of
> Appeals/decision which was to grant a special use permit to
> re-establish a home occupation as a non-conforming use *** and
> allow the employment of a person not a member of the household.
> Property located at 611 Auburn St."

Dr. Chin later withdrew his remaining appeals.

- 3 -

¶ 11        Dr. Chin began operating a home business, namely his chiropractic practice, from his residence at the Property, per the variations granted by the Board and City Council. However, a letter from Rockford's Department of Community Development to Dr. Chin, dated June 10, 1983, informed Dr. Chin he failed to renew his permit and license in September 1982. "Within 10 days of the receipt of [the] letter," he needed to renew his "Home Occupation permit and license" for September 1982. The letter also informed Dr. Chin he would still need to renew his permit and license again in September "for the year 1983 to September 1984." The record does not document whether Dr. Chin complied with the letter's directions and renewed the permit and license. There is no documentation showing Dr. Chin renewed his permit for any of the years spanning from 1982 to 2020. The record contains one renewal permit for Dr. Chin. Dated February 4, 2022, the permit is labeled "Single Family Dwelling—Renew Home Occupation," and the description reads "2021 Home Occupation Renewal for Chiropractic." There is one document indicating the City inspected the Property in September 1981. The record does not document any inspections past 1981.

¶ 12                B. Selling the Property and Continuing the SUP

¶ 13        In June 2020, the land use planner for the City mailed a letter to "the real estate agent for Dr. Christensen," which served as a zoning confirmation for the Property. The letter read: "A [SUP] was granted to re-establish a home occupation as a non-conforming use, with Variations to reduce the landscaping strips, permit a 5-foot fence and to allow the existing setbacks to remain 'as is.' " The letter noted the additional variations regarding signage and "allow[ing] the employment of a person not a member of the household was approved on January 4, 1982 with conditions."

¶ 14        By July 2022, Dr. Chin had sold the Property to Dr. Christensen, evidenced by

various permits issued to remodel the Property and one listing the owner as Dennis Christensen. Later that summer, Dr. Christensen's attorney contacted Capovilla, and requested "zoning confirmation of the continued use of a [SUP] by a new owner *** of 611 Auburn Street." The letter described Dr. Christensen's proposed use of the property "as a general medical office for patients" with "two (2) staff persons and occasionally other medical personnel." "All medical services will be provided on the first floor of the building consistent with the past use," and "[i]t is anticipated there will be approximately one patient per hour." The letter further noted, "There is residential space on the second floor [that] will remain residential space," which Dr. Christensen "intends to use *** as his secondary residence which he will use on occasion." The letter requested "zoning confirmation that the proposed use conforms to the SUP and is consistent with the past 40-year use of the Property."

¶ 15        On August 25, 2022, Capovilla issued a letter noting the Property "was granted a [SUP] to re-establish a non-conforming use (home occupation of a medical nature) in 1982." Capovilla noted the 1982 ordinance "outlined the required conditions which must be met in all cases of home occupations," including "Only members of the immediate family permanently residing on the premises shall be employed in the home occupation." He explained the 1982 ordinance was consistent with the current ordinance, "which only allows permanent residents of the home to be employed in the conduct of a home business." However, Capovilla noted "the 1982 [SUP] also allowed the employment of a person not a member of the household." He determined Dr. Christensen's proposed "use of the property would not conform to the [SUP]." He advised "that in order to allow continuation of this lawfully established non-conforming use in the R-1, Single-family Zoning District, a resident of this home must live permanently and work in this facility and only one person that is not a member of the household can be employed

at this business."

¶ 16      Dr. Christensen's attorney responded with another letter, dated September 13, 2022. In that correspondence, Dr. Christensen proposed to use the Property as his "permanent secondary residence" where "[h]e will reside *** on occasion when working at the Property." The letter identified the "employer" as the "Rockford Family Planning Center, LLC," and noted Dr. Christensen would be the employee who is also "a member of the household." The letter explained there would be one nonhousehold employee, as permitted by the SUP, namely "a registered nurse who will be responsible for dispensing medication" and "will also meet with patients when Dr. Christensen is not present." The letter noted the home business would also require services from an "independent consultant," who would be "an independent contractor" who "will set her own schedule and not be accountable to the [limited liability company (LLC)] or Dr. Christensen for specific hours." The letter stated the proposed home business/medical clinic may use volunteers, who had already been identified, and "would be temporary and not employed by the LLC."

¶ 17      The record does not document Capovilla's response, but the attorney sent another letter on September 28, 2022, seeking to "withdraw" her prior letter "[a]s a result of additional information." The new letter stated, "There is a strong desire by one of the 'employees' to reside at the Property as her permanent residence." "This person will be providing administrative services and basically all managerial and financial work to operate the business and comply with all regulations." This person will be a "permanent tenant resident, she will be residing at the Property as her home." The letter confirmed, "There will be a residential lease with the owner to reflect the terms of her occupancy as a household." This letter maintained the registered nurse will still be the "additional person employed who is not a member of the household." The nurse

"will be responsible for all patient care at the Property including dispensing medication and maintaining patient charts and records." This letter did not describe Dr. Christensen's role in this proposed use.

¶ 18    In response to Dr. Christensen's newest letter, Capovilla issued a zoning determination on October 3, 2022. It read:

> "As presented by your follow-up September 28 letter, the description of the use of the property would conform to the [SUP], as there would be one employee permanently residing at the residence and no more than one non-household person employed at this location. Once again, the property is located within the R-1, Single-family District and was granted a [SUP] to re-establish a non-conforming use (home occupation of a medical nature) in 1982. Based on the information provided within your September 28 letter, the business would be allowed to proceed and operate at this location."

Plaintiffs appealed this determination to the Board, per article 66, section 66-001 of the City's zoning ordinance (RZO) (Rockford Zoning Ordinance § 66-001 (eff. Apr. 3, 2008)). Plaintiffs alleged the approved use for the Property conflicted with various zoning ordinances (*i.e.*, Rockford Zoning Ordinance arts. 20, 53, 63 (eff. Apr. 3, 2008)) and argued "any permit, certificate or license issued in conflict with the provisions of this Ordinance is void." Plaintiffs also argued Dr. Chin's SUP had lapsed and was void and Dr. Christensen's proposed use should undergo independent review required for SUPs under section 63-001 of the RZO. See Rockford Zoning Ordinance § 63-001 (eff. Apr. 3, 2008). Plaintiffs requested relief from the Board,

including voiding the zoning determination, voiding the SUP, and requiring RFPC to go through the process outlined in the RZO.

¶ 19 On December 16, 2022, Capovilla submitted a memorandum to the Board in advance of the scheduled hearing. He recommended the Board find the plaintiffs had no standing to bring the appeal. He also recommended the Board affirm his determination "that the proposed legal non-conforming use is consistent with the previous use (home occupation of a medical nature)." Capovilla explained, "The City has been operating as if a SUP existed for the last 40 years and believes the use dates back even years prior." He attached several exhibits to the memo, to wit, documents from the City's file for the Property.

¶ 20                     C. Hearing Before the Board

¶ 21 The Board conducted a hearing on December 20, 2022. Following opening statements from plaintiffs' counsel, Capovilla provided a statement explaining his process in issuing the zoning determination. He noted Dr. Chin operated a chiropractic clinic at the Property per a SUP for 40 years. Capovilla explained a chiropractic clinic "is classified as a medical clinic" and "we do not distinguish by trades within the medical profession as to orthopedic or cardiology or whatever—everything is lumped under one category for medical uses." Capovilla stated he believed Dr. Chin purchased the Property from Dr. Daub, who had been at that location for at least 20 years and operated a home business of a medical nature before 1981: "So, Dr. Daub lived there; Dr. Chin lived there. It was a home occupation of a medical nature." He described his back-and-forth correspondence with Dr. Christensen's attorney, "explain[ing] to her how this would have to operate in order for it to be a legal non-conforming use that would then continue on."

¶ 22                    1. *Capovilla's Testimony*

¶ 23          Plaintiffs called Capovilla as a witness for their appeal. While acknowledging he was "not privy to what chiropractors can and cannot do" because he "do[es] not follow medical law," Capovilla, without identifying any source of his information, testified a chiropractic clinic qualifies as a "medical clinic" under the zoning ordinances because chiropractors "are awarded a doctorate for chiropractics. So, they are considered medical in nature." Capovilla confirmed that when the City Council granted Dr. Chin a SUP, it included language that Dr. Chin "remained subject to all provisions of the home occupation ordinance." He confirmed he did not understand the home occupation ordinance to be "varied or exempted in any way on this property."

¶ 24          Capovilla testified the Property is located in a "pretty dense residential area" that was "[p]retty typical of the older areas of Rockford." Similarly, he confirmed that Dr. Daub and Dr. Chin previously owned the Property, and both lived there while they conducted their respective practices as home businesses. He stated he rejected Dr. Christensen's proposal to use the Property as a secondary residence, explaining, "A home occupation has to have somebody living on the site that actually is employed by that business. So, if the person is an employee and they are actually the person that's living there, that would be legal." When asked if there were "any other examples of that in the City of Rockford right now," Capovilla testified, "No, because this is a very unique situation that, once again, is a lawfully established nonconforming special use that has been allowed to continue for over 50 years."

¶ 25          Capovilla stated he would still find consistent use as a home occupation at the Property if it were one medical clinic out of a larger group of medical clinics. He testified the ordinance "doesn't say that the owner of the property has to be the one living there." When asked how the person living there being a tenant who "can be thrown out on the street at any moment"

affected his analysis, Capovilla responded, "We would deal with it if that ever happened." In fact, Capovilla, testified he had not seen the lease for the tenant-employee who planned to live at the Property, but he said, "I am supposed to be receiving that very soon." He acknowledged he did not know what length of a lease term would make the tenant a permanent resident.

¶ 26 When asked to clarify section 53-001 of the RZO (Rockford Zoning Ordinance § 53-001 (eff. Apr. 3, 2008)), particularly the wording about the use as a business being "incidental" to the residential use, Capovilla, said, "[T]his portion of the home occupation for a home business ordinance doesn't apply, because once again, we are talking about a lawfully established, legal nonconforming use that existed prior to this ordinance." When asked to clarify the home business ordinance, specifically, whether the person permanently residing at the Property must be conducting their own home-based business, Capovilla did not respond directly to the question, and instead, the following colloquy occurred:

> "[PLAINTIFFS' COUNSEL:] But Mr. Capovilla, again, as I read your ordinance, it's the person's business. They may be leasing an apartment on your—a counseling business out of your apartment. But its your counseling business; it's not someone else's that you've got and you want a number of employees to do. Isn't that the way the ordinance should be read, that it is a home-based business, being actually your business?
>
> [CAPOVILLA:] This is not an apartment. This is a single family home."

¶ 27 Plaintiffs next asked about an LLC managed by Dr. Christensen. This exchange followed:

"[PLAINTIFFS' COUNSEL:] Are you aware, Mr. Capovilla, that the manager of the [RFPC], which is headquartered at 611 Auburn is managed by Dr. Christensen, which is at the other address 4236 Maray Drive?

[CAPOVILLA:] It's irrelevant.

[PLAINTIFFS' COUNSEL:] So, it's irrelevant to you that this 611 Auburn is part of a two-clinic medical practice that wants to operate in Rockford. It's irrelevant to your determination of being a home-based business?

[CAPOVILLA:] Correct."

¶ 28　　　Capovilla testified he did not receive any information about the patient volume at the medical clinic on the Property going forward. He stated the Property is "a lawfully-established location of a medical nature, and it's allowed to continue as such," "[n]o matter the patient flow."

¶ 29　　　When asked if "they" (presumably someone associated with the home business like Dr. Christensen, the LLC, or the tenant-employee) will be "required to fill out a home business application, Capovilla answered, "Yes. They have already done that" "[l]ast week." However, Capovilla could not say to whom the home-based business permit would be issued. He did not know if it would be Dr. Christensen or the LLC, saying, "Once again, I know that an application was submitted, and I will have to review the application." When plaintiffs' counsel asked for a copy of the application, Capovilla said he would provide one in the future, but he would not provide it during the hearing or after his testimony. He did not know exactly where the application was located, noting he "possibly" had it in the building somewhere.

¶ 30          Capovilla acknowledged that article 80 of the RZO placed the burden of proving a lawful, nonconforming use on the Property owner. He confirmed he could not locate the SUP, or the "actual ordinance," for the Property. He did not know the terms of the SUP, but "[b]ased on the information that's provided in the files from the City, that's the determination that was made." Capovilla could not say if the SUP contained any conditions like limiting use of the property to chiropractic clinics. He acknowledged Dr. Chin's application for the SUP listed the use as a chiropractic clinic but dismissed any suggestion the SUP, which he had never seen, restricted the Property's use to only chiropractic offices, saying, "Highly doubt that."

¶ 31          Plaintiffs' counsel next turned to employee capacity for the Property.

> "[COUNSEL:] The statement that the home business can have only one other employee outside of that home. Is that your understanding of the home business?
>
> [CAPOVILLA:] Only in this case. Most of the time, home businesses are allowed to have outside employees and outside addresses.
>
> [COUNSEL:] And so, your understanding is that this particular business, whatever business it is, *** that has the employee living—well, it will have an employee who is a permanent resident of the facility, and the one other employee. Is that your understanding of how the business is structured?
>
> [CAPOVILLA:] That would be correct.
>
> [COUNSEL:] Okay. So, if there are more employees than that, that would not meet the terms of your zoning ordinance?

- 12 -

[CAPOVILLA:] Correct."

Capovilla stated that under the proposed use, Dr. Christensen could not work at the Property, but he could supervise the nurse under the SUP.

¶ 32                                    2. *Shawn Rylatt*

¶ 33          Plaintiffs next called Shawn Rylatt, who testified he lived "about a block away," or "about *** 550 feet" from the Property. He said he could see the Property from his driveway. He testified he heard noise from "meetings" in front of the Property. He described the noise as "Protests and cars go by, you know, colorful adjectives." Rylatt testified he found the noise "annoying," "[c]onsidering the fact that I work from home and I'm on the phone 90 percent of my day, I had to explain that to somebody, you know, what's going on in the background." Rylatt stated the activity in the neighborhood since RFPC was announced as the owner of the Property had disturbed his quiet enjoyment of his property. He testified he had a 12-year-old daughter who likes to ride her bike to school, and he was worried about increased traffic in the neighborhood. He acknowledged his daughter would hear expletives from the protestors when riding her bike in the neighborhood. Rylatt testified the new clinic in the neighborhood caused him to fear his home's value would decrease. He explained his property value had not recovered since 2008, and he expected this change to the neighborhood would exacerbate the decrease.

¶ 34          On cross-examination from the Board, Rylatt clarified he lived "a block and a half" from the Property. When asked if noise from the protests compared to noise from the traffic or construction on Auburn Street, Rylatt answered, "No, because *** the cars are kind of like white noise. The language is not white noise." Rylatt said he did not know who was protesting at the Property, but he "assum[ed] the pro life initiative has been there." When a board member asked if Rylatt could have brought in "expert testimony as to the value of your property," he

answered, "I suppose it's possible, but I'm only guessing that." He explained he did not hire anyone to value his property, but he speculated it would continue to go down. Rylatt emphasized his concerns centered upon his property value, the traffic on his street, and "the general atmosphere of the neighborhood."

¶ 35        On cross-examination by Dr. Christensen's counsel, Rylatt confirmed he is a member of the Rockford Family Initiative (RFI). Rylatt testified he was not at the meeting as a member of RFI, but for himself. He said he read in an article that RFI had organized protests at the Property. When asked if he addressed his concerns about protests with RFI, Rylatt answered, no, "because they weren't the ones who were swearing." Rylatt testified he was not familiar with any website or social media scheduling or soliciting protests at the Property.

¶ 36                          3. *Meg Larkin*

¶ 37        Plaintiffs next called Meg Larkin as a witness, who testified, "I'm the clinic director at Auburn Street, 611 Auburn." She said she moved into the Property on October 17, 2022, under a lease "starting at one year, with continuation after one year." She could not recall if employment was a term in the lease. Larkin testified she gave the lease to her attorney and she anticipated the attorney would give the lease to the City. She stated she had not applied for a home-based business permit. Larkin testified the business operating on the Property was RFPC. She confirmed she did not own the business.

¶ 38        When describing RFPC's operations, Larkin would not discuss whether the business had another location on Maray Drive. Larkin testified Dr. Christensen lived in Wisconsin and the other employee at the Property was "an RN, a nurse." Larkin described the nurse's duties as taking blood pressure, educating the patient, having the patient sign consent forms, doing the ultrasound, and dispensing medication. Larkin explained the nurse is licensed in

Illinois and Dr. Christensen, who had a temporary Illinois license, supervises the nurse. Larkin described her role in the business as "administrator," explaining: "I pay the bills, make sure that the company is open, and that the paperwork is all in order." She elaborated she makes sure the location "is clean and that we have all the proper regulations and everything is set up properly." On her professional experience, Larkin said, "I have spent my life being an administrator."

¶ 39                    4. *Kevin Rilott*

¶ 40        Plaintiffs next called Kevin Rilott. He testified he was a founding member of RFI. He recalled protests at the Property. He said some protests attracted more people, while others attracted a few. He testified a resident in the neighborhood "had some—I would say not very kind words *** complaining that we were taking all their parking." He said cars would drive by and honk their horns at protestors or swerve at them.

¶ 41        Rilott described the protests as people there being present, praying, and counselors on the sidewalk offering to help women get an ultrasound or support. He stated RFI does not hold up graphic signs. His members hold up signs of Jesus and Mary. He said other groups will sometimes show up and he cannot control what signs they display.

¶ 42                    5. *Public Comment and Decision*

¶ 43        The City called no witnesses, and Capovilla informed the Board, "[S]taff is just standing on the staff memo that was presented to the Board along with the exhibits." The City's attorney added, "I don't think any other party has any witnesses." Dr. Christensen and RFPC presented no evidence.

¶ 44        The hearing then proceeded to public comments, which were to be considered a part of the record. Each speaker was sworn. Cathy Albrecht testified, "I've been a realtor in the Rockford area for 20 years." She stated:

"I will attest that if we show properties in that neighborhood, it is my professional opinion that there will be a lot of people that will not want to move into that west side neighborhood, and it will have a detrimental effect. And I have been a professional realtor in this market for 20 years, and I think that is very relevant. It's the only thing that's relevant to whether those neighbors have standing, and they do."

¶ 45    Following closing arguments from plaintiffs and the City, the Board expressed confusion on what to do next, whether to discuss the case or make a motion. One board member, Tom Fabiano, gave his "personal opinion" that the plaintiffs "don't have standing." Capovilla instructed the Board it could make a motion on standing and consider each plaintiff individually or "take it as a group." He explained, "[A]nd the group would be whether or not the Petitioners have established that they are an aggrieved party for purposes of the appeal." By a unanimous voice vote the Board passed a motion finding the plaintiffs did not have standing.

¶ 46    Capovilla then instructed, "[T]he Board can choose also to—notwithstanding the issue of no standing, make a motion to either affirm or reverse the zoning officers' determination and vote on that as well." Board member Maurice Redd asked Capovilla for an explanation of why he could not locate the SUP. Capovilla responded:

        "So based on information that was in the file, Mr. Redd, we discovered that there may or may not have been a [SUP] at this property. But we do know that somewhere along the way, the zoning officer at the time, and I think it's in your packet—that all appeals were granted for Dr. Chin, and that he could proceed with

his home occupation at that location.

So based on that information and based on fact that Mr. Chin for 40-plus years of home occupation, which requires occasional inspections by the staff, you know, we determined that was, you know, definitely a lawfully established use."

Redd asked about the lease, and Capovilla again said he did not have it, but he would make it part of the file once he received it. He explained again that the only people who can work at the Property are the administrator and the nurse. The Board made a motion to affirm Capovilla's determination, and it passed by a unanimous voice vote.

¶ 47                                    D. Proceedings in the Trial Court

¶ 48          On January 30, 2023, plaintiffs filed a two-count complaint in the trial court. Count I sought judicial review of an administrative decision pursuant to section 3-103 of the Code of Civil Procedure (735 ILCS 5/3-103 (West 2022)). Citing various Rockford ordinances, plaintiffs alleged the Board's "decision that Dr. Christensen's Medical Clinic use 'is consistent with the previously legally established non-conforming use' is in error." (Emphasis omitted.) Count II challenged Dr. Christensen and RFPC's proposed use of the property pursuant to section 11-13-15 of the Illinois Municipal Code (65 ILCS 5/11-13-15 (West 2022)).

¶ 49          On April 3, 2023, Dr. Christensen and RFPC moved to dismiss count II pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2022)). The motion argued: (1) count II is preempted by count I, "which addresses the same zoning issue," (2) plaintiffs lack standing on count II because the Board "already ruled that Movants are engaging in permitted activity on the property in accordance with applicable zoning regulations," and (3) plaintiffs have no standing for count II because their "alleged injury is not fairly traceable

to the alleged violation of an ordinance."

¶ 50    The next day, the City and the Board filed their motion to dismiss count II pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2022)), arguing the "municipality is not subject to suit under 65 ILCS 5/11-13-15 [(West 2022))]," meaning first, "Plaintiffs cannot state a cause of action on which relief might be granted," and, second, "the claim is barred by that Section."

¶ 51    On June 4, 2023, following a hearing on both motions to dismiss count II, the trial court issued an order, stating, "It is agreed by the Parties, and hereby ordered that [the City] and the Board] are not defendants in Count II, or if considered as such are dismissed." The court's order provided, "The Motion to Dismiss count II by Defendants Dr. Christensen [and] RFPC having been fully briefed and argued, said motion is stayed pending decision on Count I." The court set the schedule for briefing and the hearing on count I.

¶ 52    On September 11, 2023, the parties appeared before the trial court to argue the merits of count I (judicial review). The court eventually issued an order denying plaintiffs relief on November 6, 2023. The court determined the plaintiffs lacked standing, affirming the Board even while noting it "did not offer much in the way of specifics regarding its decision." The court likewise affirmed the Board's decision to affirm Capovilla's zoning determination. The court found the Board's construction of the SUP was not clearly erroneous, nor was the Board's decision that Dr. Christensen's proposed use proved consistent with the prior legal nonconforming use under the SUP. Finally, the court rejected plaintiffs' argument that Dr. Christensen needed to begin the SUP process anew. Based upon its ruling on count I, the court eventually granted Dr. Christensen and RFPC's motion to dismiss count II.

¶ 53    This appeal followed.

¶ 54                                    II. ANALYSIS

¶ 55         Plaintiffs raise three arguments: (1) the Board erred in finding plaintiffs lacked

standing to appeal the zoning determination, (2) the Board's decision to affirm the zoning

determination that a proposed use conformed with a prior legal nonconforming use was clearly

erroneous, and (3) the trial court erred in dismissing their claim under section 11-13-15 of the

Illinois Municipal Code. We will take each argument in turn.

¶ 56                                    A. Standing

¶ 57         Section 66-001 of the RZO provides: "An appeal to the Zoning Board of Appeals

may be taken by any person aggrieved or by any officer, department, board or bureau of the

City." Rockford Zoning Ordinance § 66-001 (eff. Apr. 3, 2008). This ordinance mirrors section

11-13-12 of the Illinois Municipal Code (65 ILCS 5/11-13-12 (West 2022)) ("An appeal to the

board of appeals by any person aggrieved or by any officer, department, board, or bureau of the

municipality."). A person's standing to appeal a zoning decision in Rockford thus turns on

whether he has been "aggrieved"—a term left undefined by the local ordinance and state statute.

So we look to the common law.

¶ 58         In the simplest terms, "standing in Illinois requires only some injury in fact to a

legally cognizable interest." *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462,

492 (1988). We have explained standing requires "an actual controversy between adverse

parties," wherein "the plaintiff is not merely curious or concerned about the outcome, but

possesses some personal claim, status or right, a distinct and palpable injury which is fairly

traceable to the defendant's conduct and substantially likely to be prevented or redressed by the

grant of such relief." *Westwood Forum, Inc. v. City of Springfield*, 261 Ill. App. 3d 911, 921

(1994) (citing *Greer*, 122 Ill. 2d at 493). "In Illinois, lack of standing is an affirmative defense,"

meaning defendants ordinarily bear the burden of raising and proving lack of standing. *Greer*, 122 Ill. 2d at 494.

¶ 59   In deciding the standing question below, the Board (and the trial court) considered whether the plaintiffs proved they suffered (or will suffer) "special damage different from damage sustained by the public generally." (citing *Treadway v. City of Rockford*, 28 Ill. 2d 370, 376 (1963); *Garner v. Du Page*, 8 Ill. 2d 155, 158 (1956)). This "special damage" language originated in two 1950s Illinois Supreme Court cases, *Bullock v. City of Evanston*, 5 Ill. 2d 22, 33 (1954) and *Garner*, 8 Ill. 2d at 158-59. Longevity notwithstanding, "special damage" remains a vague concept in isolation.

¶ 60   1. *Standing to Challenge Another's Use of Their Property Is Not Qualitatively Different From Standing Law Applied in Other Contexts*

¶ 61   In *Garner*, the county board rezoned a 120-acre tract of land from farming to industrial. *Garner*, 8 Ill. 2d at 157. The plaintiffs filed a complaint in the trial court seeking, first, to have the board's decision "declared null and void," and second, to "permanently enjoin [it] from issuing a building permit for the construction of any industrial or business buildings on the" land. *Garner*, 8 Ill. 2d at 157. The plaintiffs' complaint alleged they were taxpayers and county residents who owned "real estate in and about the city of Naperville that *** was located contiguous to and in the vicinity of the tract rezoned." *Garner*, 8 Ill. 2d at 157. The complaint further alleged the rezoning would decrease property values and "be detrimental to the welfare of the city of Naperville in that the influx of population expected to accompany the industrial use *** would overtax the city's facilities for housing, education, water, sewage disposal, traffic, and the like." *Garner*, 8 Ill. 2d at 157-58.

¶ 62   The evidence plaintiffs offered at trial did not support their allegations, however. As for proximity to the land, two plaintiffs lived "three miles from the tract rezoned" and another

owned a farm "one and one-half miles distant from the rezoned tract." *Garner*, 8 Ill. 2d at 158.

None were contiguous or in the vicinity. As for property values, no plaintiff "nor any of the

witnesses appearing in their behalf gave any evidence whatsoever relating to the values of their

properties." *Garner*, 8 Ill. 2d at 158. Defendants did, however, present evidence relating to

property value, offering testimony from "a real-estate expert who *** expressed the opinion that

[plaintiffs'] real estate was too far distant from the rezoned tract for any change in value to

result." *Garner*, 8 Ill. 2d at 158. Ultimately, the plaintiffs offered no evidence "to establish the

existence of special injury or damage to [their] personal or property rights." *Garner*, 8 Ill. 2d at

158. The trial court affirmed the county board's decision and "dismissed, for want of equity," the

plaintiffs' complaint. *Garner*, 8 Ill. 2d at 156.

¶ 63            On appeal, the *Garner* court observed: "[W]e have held that for a party to have

standing in a court of equity to complain about the use of another's property, he has the burden

of proving that he has suffered special damage by reason of such use which differs from that

suffered by the general public." *Garner*, 8 Ill. 2d at 158-59 (citing *Bullock*, 5 Ill. 2d at 33-34).

The court justified the rule as a bulwark against "harassing and vexatious suits by persons not

aggrieved [that] would most certainly ensue." *Garner*, 8 Ill. 2d at 159. Considering the facts

established in the trial court, the supreme court held, "[I]t is clear that [plaintiffs] have failed to

prove damage which is different from that suffered by the public generally and therefore have no

standing to maintain the action." *Garner*, 8 Ill. 2d at 159. The court specifically observed, "the

total failure of any evidence showing that the rezoning would depreciate" property values and

"the fact that [plaintiffs'] properties are so far distant from the rezoned tract as to make it

doubtful that any prejudice or depreciation could result." *Garner*, 8 Ill. 2d at 159. The *Garner*

court affirmed the trial court's decision.

¶ 64        The Illinois Supreme Court has not cited *Garner* for more than six decades. Notably, the court did not discuss *Garner* when it clarified Illinois's standing law in 1988. See *Greer*, 122 Ill. 2d at 488-95 (taking the "opportunity to review the law of standing in some detail"). *Garner*'s omission from *Greer* caused the Second District, in *Paul v. City of Ogle*, 2018 IL App (2d) 170696, ¶ 13, a case on which defendants rely, to question whether *Garner*'s "special damages" standard still applied. ("It is thus unclear whether a plaintiff challenging the granting of a [SUP] for a neighboring property has a duty to plead special damages."). We in the Fourth District have never cited *Garner*. Nevertheless, we are not asked to rule on *Garner*'s applicability here, as both parties cite it favorably. More importantly, though, we believe *Greer* clarified *Garner* and the two apply the same standing requirements while using different verbiage. Our colleagues in the Fifth District compared the two cases and reconciled the language. We agree with their conclusions.

¶ 65        In *Cedarhust of Bethalto Real Estate, LLC v. Village of Bethalto*, 2018 IL App (5th) 170309, ¶ 1, the plaintiff, who operated a local nursing home, sued the municipality, mayor, and trustees, challenging their decision to grant another company permission to develop a new senior citizen residential, nursing, and memory care facility. The defendant moved to dismiss the complaint, "arguing that Cedarhurst lacked standing to bring any claim because it did not plead special injury or individualized harm and, alternatively, that there was no actual controversy between the parties." *Cedarhurst*, 2018 IL App (5th) 170309, ¶ 6. The trial court agreed the plaintiffs lacked standing and dismissed the case. *Cedarhurst*, 2018 IL App (5th) 170309, ¶ 7.

¶ 66        The appellate court affirmed and, in arriving at that decision, it carefully reviewed the standing doctrine. It noted first that, as the plaintiff, "Cedarhurst was not obligated to

establish its standing in its complaint," but "once the defendants raised standing as an affirmative defense *** the burden shifted to Cedarhurst to establish that it has standing." *Cedarhurst*, 2018 IL App (5th) 170309, ¶ 14. The court observed the trial court relied on *Garner* to decide the standing question. It then reviewed standing law from *Garner* to *Greer* as it pertained to challenging another person's use of his own property. "Based upon this careful analysis," the court "conclude[d] that *Greer* explained and outlined what is required to establish standing and should be the standard used by courts." *Cedarhurst*, 2018 IL App (5th) 170309, ¶ 19. The court found "common ground" between *Garner*'s language of "special damage" or "special injuries" and *Greer*'s "injury in fact to a legally cognizable interest" language. It observed *Greer*'s wording "require[s] a distinct injury to the complaining party, even though the use of the term 'special injury' is no longer commonplace." *Cedarhurst*, 2018 IL App (5th) 170309, ¶ 20. Accordingly, the court determined, "[t]o establish standing, there needs to be a connection between the complaining party and the defendant involving an injury to a legally cognizable interest." *Cedarhurst*, 2018 IL App (5th) 170309, ¶ 20.

¶ 67         Though we have never cited *Garner*'s "special damage" language, we understand it to align with current standing law. The language in *Garner* and *Greer* differs, yet the principles are the same. The standing requirements for challenging another person's use of his property are not qualitatively different from the standing criteria applied generally. Essentially, a "special damage" is another way to allege an injury to a legally cognizable interest. See *Greer*, 122 Ill. 2d at 493. We will evaluate the standing issue in this case using *Greer*'s language and lens, bearing in mind, "the principle that standing in Illinois requires only some injury in fact to a legally cognizable interest." *Greer*, 122 Ill. 2d at 492. No matter if the injury is "actual or threatened," it "must be (1) distinct and palpable [citation]; (2) fairly traceable to the defendant's actions

- 23 -

[citation]; and (3) substantially likely to be prevented or redressed by the grant of the requested relief." (Internal quotation marks omitted.) *Greer*, 122 Ill. 2d at 492-93. Standing presents a legal question we review *de novo*, meaning we pay no deference to the Board or the trial court. *In re Guardianship of K.R.J.*, 405 Ill. App. 3d 527, 535 (2010) ("Generally, the question of standing is reviewed *de novo*."). See *Glisson v. City of Marion*, 188 Ill. 2d 211, 221 (1999).

¶ 68                                    2. *Standing in This Case*

¶ 69          As we observed, *supra* ¶¶ 33-41, plaintiffs presented evidence to the Board relating to standing, while defendants did not. Capovilla's memorandum to the Board made a conclusory recommendation on standing but offered no findings. The Board likewise made no findings related to standing. Following Capovilla's lead, the Board resolved the standing question by voting unanimously that "the [Plaintiffs] have not established that they are an aggrieved party, and the appeal does not have standing as such" The Board then issued three preprinted decisions signed and dated by the chairman, wherein each petitioner was identified and one of two options were circled: either "DOES/DOES NOT" or "DO/DO NOT" "have standing as an aggrieved party to appeal the Zoning Officer's October 3, 2022 Determination." The named petitioners before the Board included Amie Lotzer, RFI, and Shawn and Lisa Rylatt. The Board circled "DOES NOT" or "DO NOT" have standing for each petitioner. We agree with the Board's conclusions as to Lotzer and RFI; however, we disagree with the Board's conclusion as to the Rylatts.

¶ 70          The record contains no evidence concerning Lotzer or any injury to a legally cognizable interest she suffered (or will suffer) from Capovilla's zoning determination. Likewise, the record evidence does not show RFI suffered (or will suffer) an injury to a legally recognizable interest. At best, RFI demonstrated a "self-proclaimed" interest in the proceedings,

which made them "merely curious or concerned about the outcome." *Westwood*, 261 Ill. App. 3d at 921. This is not enough to establish standing for RFI or the members it represents. *Westwood*, 261 Ill. App. 3d at 921-22; see *Landmarks Preservation Council of Illinois v. City of Chicago*, 125 Ill. 2d 164, 175 (1988). We hold the Board, therefore, correctly determined Lotzer and RFI lacked standing.

¶ 71　　　　　Nevertheless, based on the record below, we conclude Shawn and Lisa Rylatt had standing to challenge Capovilla's zoning determination. They alleged and established an "injury in fact to a legally cognizable interest" (*Greer*, 122 Ill. 2d at 492), specifically, the interests in their property value and their quiet enjoyment of property. *Paul*, 2018 IL App (2d) 170696, ¶ 12 (citing *People ex rel. Klaeren v. Village of Lisle*, 202 Ill.2d 164, 176 (2002)). See *Yusuf v. Village of Villa Park*, 120 Ill. App. 3d 533, 538 (1983), overruled on other grounds by *Gallik v. County of Lake*, 335 Ill. App. 3d 325 (2002) (holding allegations of adverse impact upon the quiet enjoyment of property and property values near a subject property confer standing because they constitute interests distinct from those of the general public can assert); see also *Greer*, 122 Ill. 2d at 493 ("There is no question that a diminution in the value of property is a legally cognizable interest."). And more importantly, once plaintiffs presented evidence of standing, defendants did not prove the Rylatts did not have standing. *Greer*, 122 Ill. 2d at 494 (stating the agency, as defendants-appellants, ultimately bore the burden to plead and prove lack of standing); see *Paul*, 2018 IL App (2d) 170696, ¶ 10 ("Generally, a plaintiff need not allege facts to establish his or her standing; rather, it is the defendant's burden to plead and prove a lack of standing."); *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 252 (2010) ("Under Illinois law, lack of standing is an affirmative defense, which is the defendant's burden to plead and prove.").

¶ 72                                a. Loss of Quiet Enjoyment

¶ 73          Shawn Rylatt testified he lived within a block-and-a-half, or approximately 550 feet from the Property. He could see the Property from his driveway. He testified the atmosphere in the neighborhood changed when it became known RFPC would occupy the Property. He identified noise as one change. He said he could hear noise from "meetings" and "protests" outside the Property, including loud, "colorful adjectives." Rylatt testified he worked from home and was "on the phone 90 percent of [his] day" and the noise proved annoying and disruptive. He recalled the noise even disturbed a work call, causing him to have to explain the background noise. On cross-examination by the Board, Rylatt differentiated between traffic noise and protest noise. He stated cars are like white noise to him, while language/talking is not. Rylatt testified his 12-year-old daughter liked to ride her bike to school and around the neighborhood and he was concerned the increased traffic posed a threat to her safety. He likewise stated his concern about her hearing profane language and seeing graphic signs from protestors or counter-protestors.

¶ 74          Kevin Rilott's testimony confirmed Rylatt's concerns about changes to the neighborhood and his daughter's safety. Rilott testified about organizing protests at the property, noting some protests attracted more people than others. He stated he could not control who showed up to protest or what signs they displayed. Rilott likewise testified he could not control how others responded to the protests. He acknowledged protestors used street parking in the neighborhood. Riott testified nonprotestors would say "not very kind words" to those protesting. He testified people would drive by and honk their horns or swerve their car towards protestors.

¶ 75          Increased traffic and noise can result in the loss of quiet enjoyment of one's property, which is adequate to confer standing. *Klaeren*, 202 Ill. 2d at 176 (citing *Yusuf*, 120 Ill. App. 3d at 538). This testimony established an "actual or threatened" injury to the Rylatts' quiet

enjoyment of their property that is fairly traceable to the City and Board's decision to allow the RFPC to operate in a densely populated residential neighborhood.

¶ 76                                    b. Decreased Property Value

¶ 77          As for property value, Shawn Rylatt testified he was concerned the changed atmosphere in the neighborhood would adversely affect his home's value. Rylatt testified his property lost value in 2008 and he worried the changes to the neighborhood would cause his property's value to further decrease. Rylatt acknowledged on cross-examination by the Board that he did not hire an "expert" to appraise his home value or offer "expert testimony as to how the value of [his] property would have been affected." He said he was "speculating that [his] property is going to devalue further than it already has."

¶ 78          Rylatt's testimony describing his concerns about property values was supported during the public comment portion of the hearing. Each speaker was sworn, so it would appear the comments were testimony. The Board heard from Cathy Albrecht, who testified under oath she worked as a "realtor in the Rockford area for 20 years." Albrecht attested to her "professional opinion" that RFPC would "have a detrimental effect" on the neighborhood and home values. She explained "that if we show properties in that neighborhood, *** there will be a lot of people that will not want to move into that west side neighborhood." If people do not want to move into the neighborhood, it stands to reason property values will decrease.

¶ 79          The Board Rules of Procedure are devoid of any reference to public comments but permit any "interested party" to appear on their own behalf or through a representative, as well as "property owners entitled to notice," "a property owner who is a legal objector," and "other persons as approved by the Chairman." According to Capovilla at the outset of the hearing on the appeal in this case, "the rules of [the Board] do allow any person to speak." Once people

asked to speak, they were sworn in as witnesses and were subject to objections being lodged to their testimony and questioning by the Board. Indeed, the City objected to one person's testimony as irrelevant, the Chairman responded, and the Chairman questioned another speaker about relevance. This has all the earmarks of "testimony."

¶ 80 Rylatt's and Albrecht's testimony stood uncontradicted by the defendants. Testimony about decreasing property values, even testimony that "could not quantify the diminution in value," is sufficient to find standing to challenge zoning decisions or property use. *Klaeren*, 202 Ill. 2d 164, 172 (2002).

¶ 81 We find perplexing, if not vexing, defendants' arguments (along with the Board's and trial court's conclusions) that plaintiffs presented *no* evidence of standing. Testimony is evidence. Common sense would tell us evidence that is corroborated and uncontradicted should be persuasive. Even in the context of a criminal case, where the burden is substantially higher, "[c]orroborative evidence by its nature makes it more probable than not that a fact to be corroborated is true." *People v. Arcos*, 282 Ill. App. 3d 870, 875 (1996). Once found to be uncontradicted, unless the evidence appeared otherwise questionable, it would reasonably have some probative value for the factfinder. Similarly, defendants' briefing echoes the Board's observation that plaintiffs presented no expert testimony to support their standing claims, particularly their claim relating to property values. Nowhere do the Board, the trial court, or defendants cite a case where this court or our supreme court held expert testimony is necessary to establish standing. Notably, at oral argument, Dr. Christensen's counsel acknowledged Albrecht offered expert testimony. The City's attorney reluctantly agreed Albrecht offered testimony but asked us to give it little weight. But we have nothing to weigh it against since the City offered nothing to refute it besides Capovilla's conclusory memo.

¶ 82    Defendants also attack Shawn Rylatt's position as "disingenuous" because he is simultaneously a member of RFI and complaining about the protests' impact on his neighborhood. Again, defendants cite no case supporting their argument or desired outcome. But notably, Rylatt testified he appeared at the hearing on his own behalf and not as an RFI member. The record does not indicate he participated in the protests at the Property. Instead, he "assum[ed] the pro life initiative has been there," and he was not aware of the social media accounts that organized the protests.

¶ 83    Our conclusion in this case comports with other cases considering standing in these contexts. For example, in *Klaeren*, the supreme court found standing because testimony from the plaintiffs and a real estate appraiser "supported" their allegations relating to loss of quiet enjoyment and decreased property value. That testimony was "sufficient to confer plaintiffs with standing to pursue injunctive relief." *Klaeren*, 202 Ill. 2d at 176. We come to the same conclusion here—testimony from Rylatt, Rilott, and Albrecht was sufficient to confer standing for the Rylatts.

¶ 84    In opposing standing, defendants cling to *Garner*, but the differences between this case and *Garner* warrant different outcomes and reinforce our conclusion the Rylatts have standing. Unlike in *Garner*, there is no "total failure of any evidence" here. See *Garner*, 8 Ill. 2d at 159. Recall, none of the *Garner* plaintiffs, nor any witness on their behalf, "gave any evidence whatsoever relating to the values of their property." *Garner*, 8 Ill. 2d at 158. Not so here. The Rylatts produced some evidence relating to their property value, and Albrecht, a local realtor, provided opinion testimony property values will diminish with RFPC in the neighborhood. We find it noteworthy that the *Garner* defendants relied on opinion testimony as evidence property values would not be affected there. Why shouldn't such opinion testimony from Albrecht be

valuable here? Especially where Albrecht's opinion stands unrefuted. Further, no *Garner* plaintiff lived (or owned property) in close proximity to the rezoned tract of land. The closest plaintiffs lived more than three miles from the land, and one plaintiff owned a farm more than one mile from the land. Not so here. Unlike the *Garner* plaintiffs, the Rylatts live in the same neighborhood as the Property. They live approximately 550 feet from it and can see RFPC from their driveway. They do not rely upon taxpayer status.

¶ 85 Finally, we note the *Paul* court, in another case relied upon by defendants, found the plaintiffs had standing to challenge the grant of a [SUP] "based upon proximity alone." *Paul*, 2018 IL App (2d) 170696, ¶ 14. There, the plaintiffs alleged the proposed use under the special use permit would devalue their properties, cause run-off, and create increased noise, odors, and traffic. *Paul*, 2018 IL App (2d) 170696, ¶ 4. One plaintiff's property was "immediately adjacent to the subject tract and" another plaintiff's "property [was] within 1250 feet of it." *Paul*, 2018 IL App (2d) 170696, ¶ 14. The court found "common sense dictates" that the effects of the proposed use, like increased noise, odors, or traffic would "be felt more acutely on plaintiffs' properties" compared to those not in close proximity. *Paul*, 2018 IL App (2d) 170696, ¶ 14. The same common sense leads us to conclude the Rylatts have standing here.

¶ 86 Illinois's standing doctrine is not "meant to preclude a valid controversy from being litigated." *Westwood*, 261 Ill. App. 3d at 921. The *Greer* court observed: "Elementary justice requires that one who is hurt by illegal action should have a remedy. The central principle that grows out of this is very simple: One who is adversely affected in fact by governmental action has standing to challenge its legality." (Emphasis omitted and internal quotation marks omitted.) *Greer*, 122 Ill. 2d at 488. The Rylatts should be able to challenge a government action that changes their neighborhood's atmosphere and potentially affects their home's value. The

Rylatts are not "merely curious or concerned" about the zoning determination—there is an "actual controversy" here. See *Westwood*, 261 Ill. App. 3d at 921. They have a stake in this matter. Consequently, their challenge cannot be classified as a purely "harassing and vexatious suit[ ]" brought by an uninterested party. See *Garner*, 8 Ill. 2d at 159.

¶ 87          We find the Rylatts had standing to challenge Capovilla's October 3, 2022, zoning determination. They alleged and sufficiently supported injuries in fact to legally cognizable interests, namely their quiet enjoyment of property and their property value. The Rylatts' injuries are distinct and palpable, meaning they "differ[ ] from that suffered by the general public." *Garner*, 8 Ill. 2d at 158-59; see *Greer*, 122 Ill. 2d at 493. They live in close proximity to the Property. This is their neighborhood, where they now must deal with protests and the increased traffic and decreased parking those protests bring. Their neighborhood is now noisier than before and a place where one hears "swearing" or "colorful adjectives." The noise has disrupted Shawn's work. He is concerned his daughter will hear profanity, see graphic signs, or have to dodge increased traffic while riding her bike to and from school and around the neighborhood. The Rylatts' investment in their property could suffer if people do not want to move into the neighborhood, which a longtime Rockford realtor predicted. These are "special damages" not shared by the public at large. See *Garner*, 8 Ill. 2d at 158-59. Moreover, these injuries are fairly traceable to the defendants—RFPC's decision to place its business in a residential neighborhood and the City and Board's decision to approve the proposed use at the Property based solely on grandfathering principles, without considering whether the use would be "detrimental to or endanger the public health, safety, morals, comfort, or general welfare," or whether it would be "injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted, nor substantially diminish and impair property value

within the neighborhood." See Rockford Zoning Ordinance § 63-005-A, B (eff. Apr. 3, 2008); Rockford Zoning Ordinance § 1503.5 (eff. Aug. 8, 1980); *Greer*, 122 Ill. 2d at 493 (noting alleged decreased property values were fairly traceable to the agency's approval of a development). Capovilla acknowledged the Property sits in a densely residential area but also testified he did not investigate patient flow or traffic or other impact to the neighborhood. Finally, there is a substantial likelihood the Rylatts' injuries could be prevented or remedied by their requested relief to void either the October 2022 Certificate of Zoning Compliance or the original SUP issued to Dr. Chin. Alternatively, they asked the Board to prevent the proposed use at the Property until independent review of a SUP application was completed. Had they been given a proper, unbiased forum, and had they not been met with hostility from the City, Capovilla, and the Board, which we find patently obvious even from a cold transcript, then perhaps they could have received such relief. We hold the Rylatts had standing, and the Board and trial court erred in finding otherwise.

¶ 88        B. The Board Clearly Erred in Affirming the Zoning Determination

¶ 89        Plaintiffs next argue the Board (and the trial court) erred in determining Dr. Christensen and RFPC's proposed use of the Property conformed with the prior legally established nonconforming use under the SUP issued to Dr. Chin. We agree.

¶ 90        "On appeal from an administrative case, we review the administrative agency's decision and not the trial court's determination." *City of East Peoria v. Melton*, 2023 IL App (4th) 220281, ¶ 50. So, in deciding this issue, we review the Board's decision, not the trial court's order. The Board affirmed Capovilla's zoning determination "that the proposed legal non-conforming us is consistent with the previous use (home occupation of a medical nature)" under the SUP. The issue of whether a proposed use comports with a zoning ordinance, like a SUP, presents a mixed question of law and fact. *Platform I Shore, LLC v. Village of*

- 32 -

*Lincolnwood*, 2014 IL App (1st) 133923, ¶ 8. "A mixed question of fact and law examines the legal effect of a given set of facts." *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50. In other words, "a mixed question asks whether the facts satisfy the statutory standard or whether the rule of law as applied to the established facts is or is not violated." *Beggs*, 2016 IL 120236, ¶ 50. We review a mixed question of law and fact like this under the clearly erroneous standard of review. *Platform I Shore LLC*, 2014 IL App (1st) 133923, ¶ 8.

¶ 91       "An administrative decision is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Beggs*, 2016 IL 120236, ¶ 50. The clearly erroneous standard sits on the standard-of-review spectrum somewhere "between the manifest weight standard and *de novo* standard, so as to provide 'some deference' to the agency decision." *AFM Messenger*, 198 Ill. 2d at 392 (quoting *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998)). However, we will not "blindly defer to the agency's decision." *AFM Messenger*, 198 Ill. 2d at 395.

¶ 92       Looking at the whole record and considering the "entire evidence," we are left with the "definite and firm" conviction the Board committed a mistake in affirming Capovilla's zoning determination. Accordingly, we hold the Board's decision is clearly erroneous.

¶ 93                                    1. *Overview*

¶ 94       "In general, a 'special use' is a type of property use that is expressly permitted within a zoning district by the controlling zoning ordinance so long as the use meets certain criteria or conditions." *City of Chicago Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc.*, 196 Ill. 2d 1, 16 (2001). Under the zoning law in Rockford, a SUP is a part of a

local zoning ordinance. Under Section 63-009 of the RZO, "Every approval of a [SUP] shall be made by ordinance and shall be accompanied by written finding of fact based on the factors listed in Section 63-005." Rockford Zoning Ordinance § 63-009 (eff. Apr. 3, 2008). Furthermore, a "[SUP] shall be effective upon the passage, approval, and publication of the Ordinance approving it, as provided by law." Rockford Zoning Ordinance § 63-009 (eff. Apr. 3, 2008). Anecdotally, Capovilla called the SUP here the "actual ordinance" when explaining he could not locate it.

¶ 95　　　　　When interpreting or applying a SUP, "administrative zoning agencies must adhere to the intent of the zoning ordinance." *Chicago Heights*, 196 Ill. 2d at 20. "Municipal ordinances *** are interpreted under the general rules of statutory construction and interpretation." *Platform I Shore LLC*, 2014 IL App (1st) 133923, ¶ 8. As with interpreting statues, the aim "is to determine the legislative intent," looking to the language and giving words their plain and ordinary meaning. *Platform I Shore LLC*, 2014 IL App (1st) 133923, ¶ 8.

¶ 96　　　　　　　　　　　　　2. *This SUP*

¶ 97　　　　　To quote Capovilla, this is a "very unique situation." According to Capovilla's testimony, there is no other SUP like this in Rockford. Making this case even more exceptional, there is no physical copy of the SUP issued to Dr. Chin. No one knows the SUP's specific provisions. Neither we nor the Board have any idea what terms, conditions, or restrictions may have been written into the SUP issued to Dr. Chin, or even Dr. Daub before him. Since Capovilla "was not able to find the SUP in the City's archived files, he based his determination on the totality of the circumstances with the information he had in order to draw a conclusion that the City has been operating as if an SUP existed for the last 40 years." We assume we have been provided with the same information since no one sought to supplement the record on appeal.

There is little, if any, evidence in this record to support the conclusion of continued nonconforming use; we are left to take Capovilla's word for it. For all the reasons we outline below, we find that clearly erroneous.

¶ 98 We are compelled to comment on the holes in the information Capovilla had at his disposal. In his memo to the Board, Capovilla said, "Dr. Chin bought the property from another doctor *who the zoning officer believes was also operating a home occupation of a medical nature at the Property, for years prior.*" (Emphasis added.) But we know very little of Dr. Daub, only he owned the Property in 1981, used it as his home and chiropractic office, and requested an inspection in 1981. Despite Capovilla's memo stating the City "has records of annual home occupation permits for the Property which also indicates that the legal non-conforming use (home occupation of a medical nature) continued for decades," such "permits" are not part of the record. As evidence of the "records of annual home occupation permits" issued, the memo cited "Exhibit 15," which is part of the record before this court and contains a half-page of paper and half of a receipt. The half-page reads, "2021 Home Occupation," "Permit #: HOC19-004," and lists Dr. Chin's "Company Name" and contact information. Though different, this appears duplicative of the other permit in the record, which is a full page on letterhead and expressly says it is a "PERMIT" for "Single Family Dwelling—Renew Home Occupation" and describes the work as "2021 Home Occupation Renewal for Chiropractic." Likewise, we recall Capovilla told the Board that based on information he had of Dr. Chin's "40-plus years of home occupation, which requires occasional inspections by the staff, you know, we determined that was, you know, definitely a lawfully established use." There is evidence of one request for a building inspection by Dr. Daub in July 1981. There is evidence of *one* city-inspection of the Property in the 40 years Dr. Chin owned the property—in September 1981. The

record does not document any other inspections from 1982 to 2022, which would provide information about Dr. Chin's use of the Property.

¶ 99    In fact, the entire record reveals the large holes in the history of this SUP. For example, the exhibits the City and Capovilla submitted to the Board and this court reveal a 37-year gap in documentation relating to this SUP. The City did not submit a single document from the file for this SUP dated between June 10, 1983, and June 12, 2020. Saddled with a sparse file, Capovilla, nonetheless, determined Dr. Christensen and RFPC's proposed legal nonconforming use of the Property as a "private practice medical clinic" proved consistent with Dr. Chin's previous use as a home occupation chiropractic office under the broad umbrella of home occupation of a medical nature.

¶ 100    a. Dr. Chin's Use of the Property Under the SUP

¶ 101    Even though the record indicates Capovilla had little information on which to form his final determination, the record clearly shows the Board granted Dr. Chin a SUP "to re-establish a non-conforming use (a Home occupation of a medical nature), subject to compliance with all provisions of the Home Occupation Ordinance." Furthermore, the City Council sustained the Board's decision and approved a variance allowing "the employment of a person not a member of the household."

¶ 102    Dr. Chin lived and worked at the Property for 40 years, yet there are few details of how he used the Property. In his initial application for the SUP, he noted the "existing uses on the property" included "chiropractic physician office and home under 'Home Occupation License.' " Dr. Chin proposed using the Property as his home and chiropractic physician's office. He specified he would operate the chiropractic practice on the first floor, "[b]y appointment only." Capovilla determined (and eventually testified) Dr. Chin lived and operated his practice at

the Property for decades. He stated, "Dr. Chin indicated to City Staff that during the 40[-]year time period he operated his medical office on the Property, he had 2 different non-resident employees working for him at separate times."

¶ 103    From the record, we can surmise Dr. Chin was continuing the prior use by Dr. Daub, who owned the Property, lived there, and operated his chiropractic practice there. Critically, the formal action of the Board on November 17, 1981 was "to GRANT a *[SUP]* to re-establish a non-conforming use (a Home Occupation of a medical nature), subject to compliance with all provisions of the Home Occupation Ordinance." (Emphasis in original.) This clearly indicates they were approving the continued use of the property as a solo chiropractic practice and home owned, occupied, and operated by the doctor.

¶ 104    b. Dr. Christensen/RFPC's Proposed Use of the Property Under the SUP

¶ 105    To start, we note we do not know to whom we should properly refer when discussing activity on the Property. The current home occupation application or permit is not part of the record, even though Capovilla said he would provide it to plaintiffs. We recall he had not reviewed the application before approving the proposed use and so he did not know what name would be on the permit or who would receive it. We will use Dr. Christensen and RFPC interchangeably, believing they are one and the same without evidence to the contrary.

¶ 106    After purchasing the Property, Dr. Christensen proposed to use it "as a general medical office for patients" that "will dispense medication and provide basic medical treatment." RFPC noted the office would be open from 8 a.m. to 4:30 p.m. or 9 a.m. to 5 p.m. Monday through Friday. The office would sometimes be open on Saturdays from 9 a.m. to 12 p.m. RFPC anticipated it would see one patient per hour. After several proposals, wherein RFPC noted Dr. Christensen would use the Property as a secondary residence when in Rockford and suggested

various employment scenarios, RFPC decided one employee, the office administrator, would "reside at the Property as her permanent residence," although it was actually through a "residential lease" of an unknown duration. RFPC noted "one additional person employed who is not a member of the household" would work at the Property. This "person will be a registered nurse who will be responsible for all patient care at the Property including dispensing medication and maintaining patient charts and records." Larkin testified she is the resident employee at the Property, having moved in on October 17, 2022. She does not own the property. She signed a one-year lease, with potential continuation after a year. Larkin testified she does not own RFPC. She had not filed the application for a home occupation permit for the Property, but someone had done so in December 2022.

¶ 107 Besides owning the Property, Dr. Christensen's role in this proposed use remains vague. There was testimony indicating he would supervise the nurse, but it was unclear what his responsibilities were and whether he would ever be at the Property. In his initial letters to the City, particularly the September 13, 2022, letter, Dr. Christensen indicated he intended to be at the Property at least occasionally. Capovilla testified if the doctor was also there, along with the two employees, that would be a violation of the permit. Interestingly, rather than being a basis for denial, Capovilla said "if" it happened, "we would deal with that." This means the Board would approve the permit, knowing the permit-holder could not operate his "home occupation of a medical nature" personally, and if he did, they would then deal with any violations, as if compliance with the strict requirements of a [SUP] and municipal zoning laws was a fluid concept.

¶ 108 Capovilla's memo to the Board explained this matter was governed by Article 80 of the RZO, which pertains to "Nonconformities" and provides that "[n]on-conforming status

runs with the land." Rockford Zoning Ordinance § 80-001-D (eff. Apr. 3, 2008). Capovilla reasoned "that a home occupation of a medical nature was in existence for a minimum of 40 years and possibly 60 years, and that a continued use of that property then would be allowable per the zoning ordinance, as it was a lawfully, legally established, non-conforming use. You have to respect the property rights when people are granted something and they continue it." Skirting the need to reapply, Capovilla concluded the multilocation, corporate-owned medical clinic, with no doctor owner even working at the residence, somehow continued the prior use by a one-person home-office of a chiropractic physician with one nonresident employee. He determined Dr. Christensen's proposed use was consistent with Dr. Chin's prior legally established nonconforming use because there would be one employee permanently residing at the Property and working for the home business, there would be just one nonhousehold employee working at the Property, and the home business would be of a "medical nature."

¶ 109          We examine each point in reverse order.

¶ 110                              c. Medical Nature

¶ 111          The term "medical nature" is not adequately defined anywhere in the record. None of the RZOs in the record mention the term, let alone define it. Interestingly, the term was not included in Dr. Chin's application to register his home occupation. The City added "medical type" to the application for a SUP and variance. The 1981 zoning recommendation for the SUP labeled it as a "Home Occupation for a medical office." The term "medical nature" was added to the SUP as a parenthetical description when the Board granted the permit in November 1981. When the City Council sustained the SUP in January 1982, the decision did not refer to "medical nature." The City's June 1983 letter to Dr. Chin referred to the "Home Occupation permit," but it omitted "medical nature." What is more, the only home occupation permit for Dr. Chin in the

record, the one issued and paid for in 2022 that was for the 2021 year, does not include "medical nature." It described Dr. Chin's home occupation as "Chiropractic." Based on the record evidence, we find the import of the "medical nature" classification is murky, at best. We do not know if the actual SUP described Dr. Chin's home occupation with "medical nature," but we have his application and his later renewed permit describing it as a home occupation chiropractic office. Nevertheless, Capovilla emphasized only the "medical nature" classification, so we presume it bears importance.

¶ 112     In his initial statement to the Board, Capovilla explained a "chiropractic clinic *** is classified as a medical clinic per the zoning ordinance." He went on to say, "[W]e do not distinguish by trades within the medical profession as to orthopedic or cardiology or whatever— everything is lumped under one category for medical uses." The record is devoid of any source of that conclusion. He later testified he "d[id] not follow medical law" and was "not privy to what chiropractors can and cannot do," but he stated chiropractors "are considered medical in nature" because "[t]hey are awarded a doctorate for chiropractics." Again, this appears to be something Capovilla manufactured out of whole cloth, since there is nothing in the record to support this, nor does he identify the source of this conclusion. Ultimately, Capovilla determined Dr. Christensen and RFPC's proposed use as "general medical office for patients" where patients received medication proved consistent with Dr. Chin's past use as a chiropractic clinic—even though he did not define "medical nature" beyond having a doctorate degree. Significantly, under RFPC's proposed use, approved by Capovilla, no one holding a "doctorate" would be working at the Property or rendering any care there. It would seem, based on the limited definition Capovilla gave for "medical nature," any professional with a "doctorate" could operate a home occupation of a medical nature, no matter the actual use. A historian or a paleontologist

- 40 -

who holds a doctorate could operate a home occupation of a "medical nature" at the Property under Capovilla's explanation, yet a therapist or a dietician or a masseuse who holds a bachelor's or master's degree could not. Indeed, we notice that in a decision turning on consistency with a prior legally established nonconforming *use*, Capovilla relied upon the "medical nature" *classification* and not the actual use. *Cf. Wechter v. Board of Appeals*, 3 Ill.2d 13, 15 (1954) ("It is the particular use, and not its general classification, that is contemplated by the ordinance.").

¶ 113          Interestingly, section 80-003-B of the RZO contemplates different uses under the same classification or category. A changed nonconforming use, even classified under the same category of the prior legal nonconforming use, must go through the SUP procedures outlined in Article 63. Rockford Zoning Ordinance § 80-003-B (eff. Apr. 3, 2008). This makes sense because home businesses appear to be highly regulated by the old Home Occupation ordinances and in the current Article 53 of the RZO, including the provision that a home business permit may be revoked for "any change in the use for which the permit was issued." Rockford Zoning Ordinance § 53-007A(1) (eff. Apr. 3, 2008); see also Rockford Zoning Ordinance § 7-580 (IV)(A), (B) (eff. Dec. 8, 1970); Rockford Zoning Ordinance § 33-29(IV)(A)(B) (eff. Aug. 8, 1980); Rockford Zoning Ordinance § 1100.6 (A) (eff. July 1, 1993). We know the old Home Occupation ordinances only allowed for "restricted occupational uses" that met certain criteria. Rockford Zoning Ordinance § 7-580 (I) (eff. Dec. 8, 1970); Rockford Zoning Ordinance § 33-29(I) (eff. Aug. 8, 1980). To that end, the RZO instructs SUPs "need to be carefully regulated in terms of location and/or operation for purposes of protecting the community." Rockford Zoning Ordinance § 63-001 (eff. Apr. 3, 2008). Nevertheless, Capovilla elevates classification over use, in direct opposition to the wording of applicable ordinances.

¶ 114          We doubt Capovilla's simplistic explanation of "medical nature," tying it to a

"doctorate" degree, is correct. What is more, we question his decision not to distinguish between particular uses within the "medical nature" classification in this case, especially when the RZO distinguishes dentistry (where a dentist has a doctorate) from other practices. Critically, the only permit in this record distinguishes Dr. Chin's practice as "Chiropractic." But Capovilla stated before the Board it is customary for a zoning officer to not differentiate between practices in the medical profession. Setting aside our skepticism, we defer to Capovilla's conclusion the past and proposed use share a "medical nature."

¶ 115                    d. A Nonhousehold Employee Under the SUP

¶ 116        Capovilla found Dr. Christensen and RFPC's proposed use consistent with Dr. Chin's past use because there would be one nonhousehold employee working at the Property. The evidence confirms this view. Dr. Chin requested and received this variation for his SUP. The City Council approved it in the January 4, 1982, meeting minutes. Dr. Chin indicated to city staff he employed a nonhousehold employee when operating his chiropractic clinic at the Property. Dr. Christensen and RFPC employ one nonhousehold employee at the Property—the nurse who sees patients and dispenses medication. We agree with Capovilla's determination this is consistent nonconforming use under the SUP.

¶ 117        e. The Proposed Use Does Not Qualify as a Home Occupation and is Not
                Consistent With Dr. Chin's Past Use Under the SUP

¶ 118        We ultimately disagree with Capovilla's zoning determination "that the proposed legal non-conforming use is consistent with the previous use (home occupation of a medical nature)." There are too many inconsistencies between the proposed use and Dr. Chin's previous use, so much so the proposed use bears no resemblance to a home business at all.

¶ 119        For example, under the proposed use, the property owner does not live there. The home business owner (the one ultimately rendering medical care and prescribing medication)

will never be at the Property, and cannot be there, per Capovilla's zoning determination and testimony. Dr. Christensen owns the Property. He is the doctor prescribing medication. He lives in Wisconsin. He holds a temporary license to practice medicine in Illinois. Apparently, he will supervise the medical clinic at the Property from afar. This is not consistent with a history of two chiropractic physicians operating their chiropractic office out of their home. Regardless of the *classification*, that was the *use*. By contrast, rather than being an owner-operator of the business, Larkin lives there under a one-year lease, the terms of which even Capovilla did not know, and could not say what might happen to the validity of the SUP if the only resident left. Larkin testified she does not own the business but works as the administrator. These facts do not compare to Dr. Chin's use of owning the Property, living there, and operating his chiropractic practice in person. Capovilla testified these differences were irrelevant because Larkin was an RFPC employee permanently residing at the Property. He testified, "They live there. As long as they are employed and there is one permanent resident of the home—it does not say that you own the property—it does not say that—in order to operate the home business." He essentially reduced use to someone living there who also works there.

¶ 120          We have little confidence in Capovilla's understanding and application of the Home Occupation Ordinance. His testimony often contradicted the RZO's plain text (both past and present). For example, he testified the "portion of the home occupation for a home business ordinance" that required the business use be incidental to residential use of the property doesn't apply because "we are talking about a lawfully established, legal non[-]conforming use that existed prior to this ordinance." But Capovilla failed to realize the "incidental use" language has been in the Home Occupation Ordinance dating back to its inception in 1970 and most certainly applied to the SUP that incorporated the 1980 version of the ordinance. See § 33-29(I), (II)(A)(1)

(eff. Dec. 8, 1980). The "incidental" language most certainly applied here. Merriam-Webster defines "incidental" as "minor consequence." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/incidental (last visited on Mar. 5, 2025). Black's defines "incidental" as "Subordinate to something of greater importance; having a minor role." Black's Law Dictionary 392 (5th pocket ed. 2016). There is no way to look at this proposed use, and the sudden "strong desire" of the administrator to live there after other proposed uses were rejected, and conclude the business is incidental to the Property being used as a residence. Quite the opposite. Even though plaintiffs' counsel quoted the current Article 53, Capovilla did not know the history of the home occupation ordinance or recall if the ordinance was incorporated into the SUP he could not locate.

¶ 121        Capovilla also misstated the Home Occupation Ordinance when explaining this unique SUP. Contrasting this SUP allowing a home business with one nonhousehold employee, he testified, "Most of the time, home businesses are allowed to have outside employees and outside addresses." This statement flatly contradicts the Home Occupation Ordinance requirements that "only permanent residents of the home may be employed in the conduct of the business" and "Home business may be conducted only within the residence and not in accessory structures." (Emphasis omitted.) Rockford Zoning Ordinance § 53-003-A, 53-003-D (eff. Apr. 3, 2008); see Rockford Zoning Ordinance § 33-29 (II)(3), (7) (eff. Dec. 8, 1980). If there is another authority for his view, he did not cite it. Likewise, Capovilla's testimony that it would be irrelevant if the home business at the Property "is part of a two-clinic medical practice" contradicts the ordinance. We cannot follow Capovilla's rationale on this one. If a home occupation must confine itself to the principal building, it cannot operate as a part of a two-location practice. The Home Occupation Ordinance contemplates one location for the business.

Rockford Zoning Ordinance § 53-003-A (eff. Apr. 3, 2008); Rockford Zoning Ordinance § 33-29(II)(7) (eff. Dec. 8, 1980).

¶ 122 Capovilla also testified RFPC's proposed use would be consistent with the SUP and the previous use, "[n]o matter the patient flow." First, we note RFPC provided no evidence of Dr. Chin's patient flow. The record indicates it was by appointment only. Capovilla made no finding as to Dr. Chin's patient flow. Second, the 1980 Home Occupation Ordinance limited congestion by providing that "no more than ten (10) people may avail themselves of the services provided by the home occupation use at a given dwelling units at any given moment in time." Rockford Zoning Ordinance § 33-29(II)(A)(5) (eff. Dec. 8, 1980). It went on to say, "a home occupation shall not create pedestrian, automobile, or truck traffic significantly in excess of the normal amount in the district." Rockford Zoning Ordinance § 33-29(II)(A)(5) (eff. Dec. 8, 1980). Patient flow mattered.

¶ 123 Finally, we cannot agree with Capovilla's implicit determination that one need not own the business he conducts out of his home. When plaintiffs' counsel asked him to clarify whether a person had to be conducting their own business under the Home Occupation Ordinance, Capovilla chose to give a nonresponsive answer.

"[PLAINTIFFS' COUNSEL:] But Mr. Capovilla, again, as
I read your ordinance, it's the person's business. They may be
leasing an apartment on your—a counseling business out of your
apartment. But it's your counseling business; it's not someone
else's that you've got and you want a number of employees to do.
Isn't that the way the ordinance should be read, that it is a
home-based business, being actually your business?

> [CAPOVILLA:] This is not an apartment. This is a single
>
> family home."

Capovilla opted to provide no interpretation of the SUP or ordinance governing home businesses, neither the 1980 nor current version. While we know little about this SUP, we do know it incorporates the 1980 Home Occupation Ordinance. Capovilla testified the ordinance was not "varied or exempted in any way on this property." The proposed use must comply with the ordinance.

¶ 124 We understand the 1980 Home Occupation Ordinance requires a person to own the business. We note the Home Occupation Ordinance recognized "that certain limited home occupational uses can be useful to both the general community as well as the resident-*proprietor*." (Emphasis added.) Rockford Zoning Ordinance § 33-29(I) (eff. Dec. 8, 1980). The plain and ordinary meaning of "proprietor" is "owner"—"a person who has the legal right or exclusive title to something." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/proprietor (last visited on Mar. 3, 2025). See Black's Law Dictionary 635 (5th pocket ed. 2016) (defining "proprietor" as "An owner, esp. one who runs a business"). By using the word "resident-proprietor," the City expected and intended a person engaging in a home occupation would own the business. This resonates with the ordinance's stated intent of only allowing "certain types of restricted occupational uses within residential districts." Rockford Zoning Ordinance § 33-29(1) (eff. Dec. 8, 1980). Anyone interpreting the ordinance, from a zoning officer to a zoning board to a court, must defer to the intent of the ordinance. *Chicago Heights*, 196 Ill. 2d at 20. Capovilla's interpretation did not take into account the home occupation ordinance's intent, or even the past use, where Dr. Chin owned and operated his own business at the Property.

¶ 125     Even if ownership was not required by the 1980 Home Occupation Ordinance, the proposed use would still not comport with Dr. Chin's previous use under the SUP, and Dr. Daub before him. For decades, Dr. Chin owned and lived at the Property while operating his chiropractic clinic on the first floor. Decades before that, Dr. Daub owned the Property and used it as his residence and chiropractic clinic. Defendants' proposed use departs from this standard. Not only that, but this is also a marked change from the Property's prior use—it is apples and oranges. Based on the evidence before the Board, a multisite corporation, RFPC, proposed to operate a "general practice medical clinic" in what is clearly a single-family dwelling within a densely residential neighborhood. The only resident is a tenant-employee with no assurance of permanency, living there under a one-year lease, "with continuation after one year." The doctor, registering under the aegis of a home occupation license, does not live there, and under the terms of the SUP, according to Capovilla, he cannot even be there without violating the terms of the SUP. We find it noteworthy Capovilla had not seen Larkin's lease and had not reviewed the home business permit application before finding the proposed use consistent with legally established prior nonconforming use. As has been noted throughout, Capovilla found the proposed use consistent with a SUP he could not find and could not confirm ever existed. He based his conclusion on the totality of the circumstances, which did not amount to much. There was a 37-year gap in the documents the City gave to the Board. The Board affirmed Capovilla based on what appears to be blind deference. The Board yielded to Capovilla all the way, and only one member ventured to inquire into how a SUP—an ordinance that was supposed to have been published—had been missing for decades or whether Capovilla would actually review and provide the lease. We cannot do that—we will not "blindly defer to the agency's decision." *AFM Messenger*, 198 Ill. 2d at 395. Considering the "entire evidence," we are "left with the definite

and firm conviction that a mistake has been committed" here. *Beggs*, 2016 IL 120236, ¶ 50. We reverse the Board's decision to affirm Capovilla's zoning determination.

¶ 126 C. The Trial Court Erred in Granting Defendants' Motions to Dismiss

¶ 127 Count II in plaintiffs' complaint challenged the proposed use of the Property pursuant to section 11-13-15 of the Illinois Municipal Code (65 ILCS 5/11-13-15 (West 2022)), which provides:

> "In case any building or structure, *** including fixtures, or land,
> is used in violation of an ordinance or ordinances adopted under
> Division 13, 31, 31.1 of the Illinois Municipal Code, or of any
> ordinance or other regulation made under the authority conferred
> thereby, *** any owner or tenant of real property, within 1200 feet
> in any direction of the property on which the building or structure
> in question is located who shows that his property or person will be
> substantially affected by the alleged violation, in addition to other
> remedies, may institute any appropriate action or proceeding ***
> to restrain, correct, or abate the violation."

¶ 128 Defendants filed two motions to dismiss count II pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2022)). Dr. Christensen and RFPC filed their motion first, and the City and Board filed their motion shortly thereafter. A "court's dismissal of a complaint pursuant to section 2-619.1 is reviewed *de novo*." *Madison County v. Illinois State Board of Elections*, 2022 IL App (4th) 220169, ¶ 42. On June 4, 2023, the court determined, and the parties agreed, the City and Board were not defendants on count II and, if they ever were considered defendants on that count, they were dismissed. We agree because

section 11-13-15 does not authorize suits by private landowners against municipalities or administrative agencies. *Dunlap v. Village of Schaumburg*, 394 Ill. App. 3d 629, 639 (2009).

¶ 129　　　　Dr. Christensen and RFPC moved to dismiss "Count II of Plaintiff's Complaint pursuant to 735 ILCS 5/2-619.1 [(West 2022)]." The motion argued count II was "barred by other affirmative matters avoiding the legal effect of or defeating the claim" under section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2022)), specifically, count I (the request for judicial review) preempts count II and plaintiffs lack standing to bring their statutory claim. The motion referenced section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2022)) but failed to identify the points or grounds relied upon for relief from that section. In fact, the motion does not fully cite section 2-615. Consequently, the motion did not comply with the statutory requirements, and the trial court should not have considered it. *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 21. Despite the motion's flaws, the trial court eventually granted it based on its determination on count I and dismissed count II. The court reasoned that since it agreed with the "zoning decision *** [that] there was a [SUP] that applied, that this use is conforming, and the [Board] approved of that," then "there isn't a violation, a zoning ordinance violation upon which [plaintiffs] have a separate right to proceed." As we explained above, the Board (and the court) clearly erred in finding the proposed use was consistent with the legally established prior nonconforming use. Consequently, the court's sole rationale for granting the motion to dismiss cannot stand. We remand for further proceedings on count II.

¶ 130　　　　　　　　　　　　III. CONCLUSION

¶ 131　　　　For the reasons stated, we reverse the trial court's judgment. We remand for further proceedings consistent with this order.

¶ 132 Reversed and remanded.